Submitted on the record October 21, accused disbarred December 19, 1991

## In re Complaint as to the Conduct of

## William G. BENJAMIN,
*Accused.*

## (OSB 87-119; SC S37460)

823 P2d 413

Susan K. Roedl, Assistant Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

No appearance *contra*.

PER CURIAM

**PER CURIAM**

This disciplinary case involves a lawyer's mishandling of clients' funds and legal problems entrusted to him. The Bar charges the accused with violations of eight professional standards, including withholding money from clients and personal use of some of that money, neglect of clients' legal matters, and failing to respond to the Bar's initial inquiry about the allegations. In March of 1991, a Trial Panel found the accused guilty of violating five disciplinary rules and recommended disbarment.

On automatic *de novo* review, ORS 9.536(2), (3), under the clear and convincing standard applicable to alleged disciplinary rule violations, we find the accused guilty of six violations and disbar him.

The accused received payments on two time-payment contracts belonging to his clients, deposited the payments in a trust account established for the purpose of receiving those payments only and, after deducting a $15 fee for his collection and disbursement services, remitted the balance to the clients.

The record clearly and convincingly shows that remittances by the accused were sporadic, that adequate accountings were nil, although repeatedly requested by the clients, and that the accused drew checks for over $1,900 on the trust account for payment of the accused's office and residential rent and did not return those funds to the trust account promptly after he admittedly learned of that misuse of trust funds. At the time of the Trial Panel hearing in 1991, $480 remained in the trust account, unpaid to its admittedly rightful owners, the clients.

The accused asserted in his testimony that these facts represent an inadvertence rather than an intentional misappropriation. The accused testified that, including his personal account and this trust account, he had three separate account checkbooks in the same desk drawer, that all looked alike, and that he picked up the wrong book to pay his personal bills, even though the checks in that book had printed on them "Client Trust Account." All three accounts were in the same branch of a single financial institution, and all checks were of the same color.

The accused agreed, at the time of the Trial Panel hearing, that all of the money remaining in the trust account belonged to the clients. He explained the delay of several years in giving the clients their money by pointing out that he inadvertently deposited some of his personal business income into the trust account rather than his business account. He proved such a deposit in error of $375, but the checks that he wrote for personal expenses were for over $1,900. The accused testified that, after the personal funds and the trust funds were commingled, he had difficulty determining how much of the trust account balance belonged to his clients. He testified that he assumed, until the day of the Trial Panel hearing, that the money in the trust account was either his or represented a mistake of the bank that occurred by a credit of someone else's funds to his trust account rather than to the proper account of an unknown third party.

The accused contends that his misappropriation was not a dishonest act and that he suffers from an emotional condition that prevented him from responding adequately to his clients' and the Bar's inquiries. Characteristic of his statement of the latter defense are the following excerpts from his testimony:

> "Well, one of the problems I had was, it was very difficult for me to stay in my office. I mean, I would get there and the first thing I would do was take off my coat, pick up my coffee cup and go on out and take a coffee break. And then I would come back and move some papers around and finally I'd get sat down and work for awhile. But more often than not, I would get up and I would take a file or a couple of letters or something and I would go next door to the deli and I would do a lot of my letter writing there, go find a remote table and sit there and do that. I just could not stay in my office, I just could not stay in my office. . . . And I wouldn't stay late. I would usually leave at 3:00, 3:30. And there were times when my brain would be telling me to stay there, but I just couldn't stay there, I had to get out, I had [to] get out.

> "[Consulting an industrial psychologist several years before the events of this case] helped me not to get clients that I shouldn't be taking, but in fact today I don't think I'm recovered yet and I don't know when I'll be recovered. I know that when this matter is over, that I am going to go back to a psychologist and try to find out why I got into the state that

I'm in. I'm not talking about this case. I'm talking about mentally, physically and emotionally.

"* * * * *

"So it was total consternation on my part. I just couldn't seem to get the darn thing together and I just couldn't seem to get into the file and I was continually being hammered on this account."

No brief accompanied the accused's petition for review.

The Bar asserts that the evidence establishes that the accused failed to provide competent representation of clients who entrusted him with the collection and disbursement of contract payments. The Bar also asserts that the evidence demonstrates that the accused failed to make an accounting when requested and failed to pay funds received on behalf of the clients to those clients, that $480 of the contract payment funds remained in the accused's trust account for several years after the funds were due to the clients, adding to the harm to those clients, and that the accused used his clients' money to pay his personal expenses. The Bar characterizes the accused's use of the clients' assets as "conversion."

As can be seen, the underlying facts are all but undisputed. The dispute arises over the mental state with which the accused participated in the conduct disclosed by those facts.

The Bar contends, stated simply and based on the accused's alleged handling of matters for clients, that the accused is a danger to the public. The Bar asserts that he knowingly allowed paralysis to set in with respect to the matter precipitating this case and did not attempt to protect his clients from his problems, including the work-place inertia described in the accused's above-quoted testimony.

The record of neglect of matters entrusted to him amply demonstrates that the accused violated DR 6-101(B), which provides:

"A lawyer shall not neglect a legal matter entrusted to the lawyer."[1]

---

[1] Former DR 6-101(A)(3) in part provided: "A lawyer shall not: * * * (3) Neglect a legal matter entrusted to him." The accused's conduct also would violate the

DR 9-101(B)(3) and (4) provide that the lawyer shall:

"(3)   Maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the lawyer's client regarding them.

"(4)   Promptly pay or deliver to a client as requested by the client the funds, securities or other properties in the possession of the lawyer which the client is entitled to receive. Under circumstances covered by DR 9-101(A)(2), the undisputed portion of the funds held by the lawyer shall be disbursed to the client."[2]

The accused violated both quoted subsections of that rule.

DR 9-101(A)(2) provides:

"No funds belonging to the lawyer * * * shall be deposited [in the client's trust account] except as follows:

"* * * * *

"(2)   Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."

The accused violated that rule when he deposited his own funds in the account; the subsection (2) exception does not apply to the facts of this case, in that the $15 fee per monthly remittance is not involved or disputed here. The clients made no dispute about any portion of the common fund that the lawyer had a right to receive, and the lawyer did not claim that he erroneously deposited the amount withheld, let alone the amount withdrawn by him for personal use. The accused had no colorably valid claim to the $480 withheld from his clients for years.

---

former Disciplinary Rule, assuming that it was applicable to the first portion of the protracted period over which the conduct complained of stretches.

   [2] We agree with the Trial Panel that accused's conduct, as proved in the record in this simple matter, does not warrant a finding of violation of former DR 6-101(A)(1) or (2), relating to *competency* in handling a legal matter.

DR 1-102(A) in part provides:

"It is professional misconduct for a lawyer to: * * * (3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

The accused is guilty of violating this rule. The accused converted his clients' funds to his own use. Even if one were to credit his explanation about confusion of checkbooks (which we do not do, because the checks contained the printed legend "Client Trust Account"), the accused continued to use his clients' money for some time after he was abundantly aware that the trust account was the source from which he had improperly drawn the funds that he had used to pay his personal expenses. Several years later, he was still holding some of his clients' money.

DR 1-103(C) provides:

"A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

This rule requires a prompt response. *In re Haws*, 310 Or 741, 750-51, 801 P2d 818 (1990). Unlike Haws, who returned some sort of response, albeit terse and seemingly impolite, the accused simply and intentionally did not respond until summoned before the local professional responsibility committee many months later. Even then, the accused did not assert "any applicable right or privilege," DR 1-103(C). Neither was the accused, a person with six years of banking experience, prepared to discuss accurately the facts of the matter in issue.[3] The accused violated DR 1-103(C).

## SANCTION

This court accepts the guidance found in the American Bar Association Standards (ABA Standards) for selecting

---

[3] We make no finding that the accused intentionally deceived the local professional responsibility committee during its investigation. The violation of DR 1-103(C) present here is based on the accused's lack of response to the initial inquiry about the clients' complaint. However, the severity of that violation is increased by the accused's failure, months later, accurately to perform the relatively simple arithmetic needed to supply the local committee with a correct statement of the amount owed to the clients.

the nature and severity of the sanction to be applied.[4] The ABA Standards analyze conduct by examining the professional duty violated, the mental state accompanying the violation, and the injury or potential injury to others, including clients. Here, the accused's misappropriation of clients' funds was intentional. The clients were harmed thereby, and the duty to avoid the conduct leading to that harm is clear and well understood by all members of society, not just members of our profession.

Drawing together the factors of duty, mental state, and injury, and before examining the aggravating and mitigating considerations, the ABA Standards provide:

"5.11    Disbarment is generally appropriate when:

"* * * * *

"(b)    a lawyer engages in any other *intentional* conduct involving dishonesty, fraud, deceit, or misrepresentation that *seriously* adversely reflects on the lawyer's fitness to practice." (Emphasis added.)[5]

"7.1    Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public or the legal system."

Disbarment is within the range of appropriate sanctions in this case, because we find the conduct intentional, the reflection on fitness to practice serious, and the injury to the clients potentially serious.

---

[4] *See In re White*, 311 Or 573, 588-89, 815 P2d 1257 (1991) (Oregon law echoes theme of ABA Standards); *In re Benson*, 311 Or 473, 478, 814 P2d 507 (1991) (this court is guided by the ABA Standards for determining the appropriate sanction); *In re Leonard*, 308 Or 560, 784 P2d 95 (1989) (applying ABA factors); *In re Hereford*, 306 Or 69, 75, 756 P2d 30 (1988).

[5] ABA Standard 5.13 supports reprimand where the state of mind is "knowingly" rather than intentionally or the misrepresentation merely reflects on fitness rather than "seriously" reflecting on it.

We turn to a consideration of the aggravating and mitigating factors presented. The ABA Standards' "aggravating" factors relevant here are the following:

"(a)  prior disciplinary offenses;
"(b)  dishonest or selfish motive;
"(c)  a pattern of misconduct;
"(d)  multiple offenses;
"(e)  bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
"* * * * *
"(i)  substantial experience in the practice of law;
"(j)  indifference to making restitution."

All of the aggravating factors quoted are present.[6]

We comment only on factor (a), prior disciplinary offenses. The accused was admitted to the practice of law in 1982. He was disciplined in 1984, by a letter of admonition, for neglect of a legal matter and failure to cooperate with the Bar's investigation of complaints concerning it. He was suspended in 1988 for 60 days for mishandling a decedent's estate over a lengthy period. The 60-day suspension involved multiple violations of professional standards. In that proceeding, the accused stipulated that he had taken an attorney fee from the checking account of a probate estate without court approval and that he had told Bar investigators inconsistent stories about whether he had done so. Again, he failed to respond to the Bar's initial inquiries.

This is the accused's third violation of DR 1-103(C). At the time of each of the two previous violations, the accused was advised in writing that lawyers are required to cooperate by responding to inquiries from the Bar regarding complaints about their professional conduct.

The ABA Standards' "mitigating" factors relevant here are the following:

"(g)  character or reputation;
"(h) . physical or mental disability or impairment;
"* * * * *
"(l)  remorse * * *."

---

[6] See also the comment on increased severity of the violation in note 3, *supra*.

While all these mitigating factors are relevant, not all were established. The only testimony to the effect that the accused is believed to be honest came from the accused himself and from his minister. The same two witnesses are the only ones to testify that the accused was remorseful about his inability to work on matters. The evidence about the accused's psychological difficulty in working is insufficiently persuasive to establish a physical or mental disability or impairment. The mitigating factors present do not balance, or even put much of a dent in, the aggravating factors present.

The accused is disbarred from the practice of law commencing on the effective date of this decision. The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).