Argued and submitted April 29, 1997, accused suspended for six months
January 23, 1998

In re Complaint as to the Conduct of

DENI STARR,
*Accused.*

(OSB 94-145; SC S41967)

952 P2d 1017

Jane E. Angus, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

Gillette, J., filed an opinion concurring in part and specially concurring in part, with Van Hoomissen and Durham, JJ., joining.

## PER CURIAM

This is a lawyer discipline proceeding. The Oregon State Bar (Bar) alleges that the accused violated DR 1-102(A)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), *former* DR 9-101(A) (1992) (failing to deposit all funds of a client into a trust account), and *former* DR 9-101(B)(1) (1992) (failing promptly to notify a client of the receipt of the client's funds). A trial panel of the Disciplinary Board found the accused guilty of violating those disciplinary rules and concluded that disbarment is the appropriate sanction.

Because of the extent of the sanction, this court must review the trial panel's decision. ORS 9.536(2); Rule of Procedure (BR) 10.1. This court reviews the trial panel's decision *de novo*. ORS 9.536(3); BR 10.6. The Bar has the burden of establishing misconduct by clear and convincing evidence. BR 5.2.

On *de novo* review, we conclude that the accused has violated *former* DR 9-101(B)(1) and *former* DR 9-101(A), but that the Bar has not met its burden of proof as to the charged violations of DR 1-102(A)(3). We further conclude that the appropriate sanction in this case is a six-month suspension.

## I. FINDINGS OF FACT

The accused was admitted to the practice of law in Oregon in 1983. From 1983 to 1995, she practiced mainly in the areas of domestic relations and personal injury, and mostly in a solo practice. In late 1994, the accused entered into a stipulation for discipline, pursuant to which she was suspended from the practice of law for a period of 18 months, beginning January 1, 1995, for a series of disciplinary violations charged in an earlier proceeding. The accused was under that suspension at the time of the hearing in this matter.

We turn to the facts relating to the present charges. In early 1991, a shelter for battered women referred Charlotte Olson to the accused for representation in connection with a juvenile court proceeding concerning Olson's minor son. Olson paid the accused a $200 retainer under a written

fee agreement to pay $50 per hour, plus expenses. Olson lost her job. The court then appointed the accused to represent Olson in the juvenile court proceeding, but Olson remained responsible for paying the accused for services performed before the appointment. The accused notified Olson by letter that she had incurred $258 in fees for that matter. Olson agreed to make payments of $50 per month on the juvenile court matter.

Olson had custody of her son. During the pendency of the juvenile proceeding, the child's father, Stephen Kilpper, took the child for an approved visit. He did not return the child to Olson. Instead, he left the state and filed for a change of custody in Texas.

Olson retained the accused to represent her in the ensuing custody dispute. Olson signed no written fee agreement, but she orally agreed to pay the accused $80 per hour. With Olson's permission, the accused hired a lawyer in Texas to seek dismissal of the custody proceeding there. Kilpper left Texas and moved to Florida. Again with Olson's permission, the accused hired an investigator to locate Kilpper, personally traveled to Florida, and obtained an order requiring Kilpper to return the child to Oregon. Olson eventually regained custody of her son.

By May 1992, the accused had billed Olson for $5,216.40 on the custody case. On July 1, 1992, Texas counsel was owed $540.62.

The accused also represented Olson in connection with a personal injury claim for assault against a boyfriend, Christopher Clair. On that matter, the accused represented Olson pursuant to a contingent fee agreement calling for the accused to be paid one-third of any amount collected if the case settled after the institution of an action, but before trial. The accused filed an action on Olson's behalf and obtained a default judgment against Clair for about $33,000.

The accused sought to collect the Clair judgment. As part of that effort, she obtained a continuing writ of garnishment against Clair's wages.

By letter dated March 31, 1992, the accused, on behalf of Olson, agreed to pay the Texas lawyer $100 per

month beginning in May 1992 and to pay at a faster rate if money were collected on the Clair judgment. Olson also agreed to apply a portion of the money received from the Clair judgment against her outstanding bill with the accused.

As a result of the writ of garnishment, the accused received five checks from Clair's employer. Each check was made payable to Olson, and the accused endorsed each one, "Deni Starr for Charlotte Olson." The following chart shows the date of each check, the amount, the deposit date, and where the check was deposited:

| Date of Check | Amount | Deposit Date | Place of Deposit |
|---|---|---|---|
| 1. May 14, 1992 | $169.95 | May 20, 1992 | Trust account |
| 2. May 28, 1992 | $158.12 | June 2, 1992 | Trust account |
| 3. June 9, 1992 | $158.11 | June 15, 1992 | Trust account |
| 4. July 1, 1992 | $172.01 | July 7, 1992 | General business account of accused |
| 5. July 8, 1992 | $158.12 | July 16, 1992 | General business account of accused |

The accused promptly notified Olson of the receipt of the first check and obtained Olson's oral permission to endorse the check and deposit it in the trust account. However, the accused failed to provide Olson with express notice about the receipt of the last four garnishment checks.

Olson orally authorized the accused to disburse $50 to the Texas lawyer, $50 to Olson, and $50 to the accused from the first garnishment check. From the garnishment proceeds, the accused paid Olson $50 by a check dated May 19, 1992, and $50 by a check dated June 15, 1992. Also from the garnishment proceeds, the accused paid the Texas lawyer $50 on three occasions (May 20, 1992; June 2, 1992; and June 15, 1992). By transfer from the trust account, the accused paid her business account $50 from the garnishment proceeds on May 20, 1992, $100 on June 2, 1992, and $50 on June 15, 1992.

The accused wrote a letter dated September 28, 1992, to Clair's employer, stating that she had not received any garnishment checks since July 7, 1992, and inquiring whether the company still employed Clair or had a forwarding address for him. The employer declined to provide any information to the accused on the basis that, by that time, she no longer was Olson's lawyer.

The accused represented Olson with respect to a fourth and final matter, a tort claim against the state agency then known as Children's Services Division (CSD), arising out of its actions in the juvenile proceeding. Olson signed a written contingent fee agreement, pursuant to which the accused would receive one-fourth of any recovery if the case were resolved before the filing of an action. On June 22, 1992, Olson and the accused had a telephone conversation. In that conversation, Olson authorized the accused to settle the CSD tort claim, before the filing of an action, for $8,500. The accused was entitled to a contingent fee of $2,125 from that settlement.

In the June 22 telephone conversation, according to Olson, Olson and the accused "discussed something to the effect that the money would be used to pay my [Olson's] bill for the family law matter, and also any expenses and fees incurred by other attorneys and investigators. And she was to receive her contingency share." Olson wanted to pay "at least" half her bill for the family law matter. Olson and the accused discussed in "general terms" that the proceeds from the CSD case were "to be used to pay the bills. And I [Olson] understood that." On June 23, 1992, the accused wrote a letter to Olson as follows:

"As you will recall, during our conversation yesterday, you stated that you were happy with the offer of $8,500, did not expect to get more from CSD, would take that amount but wanted to dispute your share of it. Based on those statement [sic], I contacted Risk Management and indicated the case was settled. The check should arrive this week or the first of next week.

"I'm willing to do the following in terms of dividing the check. You indicated that you were willing to let me take out my contingency share plus half of the divorce fees owed.

I will do that with the understanding that the balance of my fees will be paid 1) by any money I get out of Chris Clair until I'm paid in full, 2) by any money we get out of Texas above my contingency share until I'm paid in full, and 3) you would pay me $100.00 starting in August payable in two installments, $50 by the 5th, and $50.00 by the 20th.

"That means that out of this check, I'd get $4,725, [the Texas lawyer] would get $500, [an investigator] would get $260, and you would get $3,015."

Olson received the accused's letter on or about June 24, 1992. She called and left a message "to the effect that I agreed with most of the content of this letter but not all of it." The accused did not return that call and did not discuss the disbursement of the CSD settlement check personally with Olson again.

On June 25, 1992, CSD sent the $8,500 settlement check and a release to the accused. The check was made payable to "Charlotte L. Olson & Deni Starr[,] her att[orne]y."

When the check arrived, the accused's assistant (to quote the assistant's testimony) had a telephone "conversation with Charlotte [Olson] regarding the check, and received instructions from her regarding what she wanted done with that check, and then [the assistant] conveyed that back to [the accused]." Olson told the assistant that "she was not going to come into the office to get the check" and that the accused "was to go ahead and deposit the check." When the assistant relayed that message to the accused, the accused asked her to repeat the message "just to make sure that she was clear." The assistant understood, and conveyed to the accused, that Olson gave permission to make sure that the check was deposited without the need for Olson to do anything with the check.

The accused endorsed the CSD settlement check both for herself and for Olson and deposited it into her trust account on June 29, 1992. On the same date, the accused disbursed $4,725 from the CSD settlement proceeds to her business account.

Some time between June 24 and June 29, 1992, Olson called the office of the accused and left a message saying, "[Y]ou're fired." On June 30, 1992, Olson met with another lawyer and retained him with respect to all matters previously handled by the accused. On July 15, 1992, Olson's new lawyer sent the accused a letter informing her that Olson had retained him in connection with all legal matters. The letter sought copies of all files, time records, settlement checks, and garnishment returns. The letter also stated: "In addition, you are not authorized to negotiate any checks or other instruments received in [Olson's] case."

On July 17, 1992, the accused wrote a letter to Olson's new counsel. Among other things, that letter stated: "I did get [Olson's] message that I was 'fired' and your letter with request for release of the file." That letter further stated:

> "*Sums due* have been paid out of the recovery from the CSD case and Clair collection. Charlotte [Olson] and I did talk about paying her a lump sum even with these amounts outstanding, but the offer was with the understanding that she needed the money desperately, and would agree to pay off the balance with monthly payments. Her decision to hire you indicates she is not financially destitute as she has claimed, and does not intend to work with me to pay me off monthly." (Emphasis added.)

Also on July 17, 1992, the accused prepared two checks on her trust account, payable to herself and to her business account and labeled "Olson," for $1,000 and $1,500, respectively. The remainder of the $8,500 CSD settlement that was not disbursed at various times to the accused or to the accused's business account had been paid to third parties (the investigators and the Texas lawyer) for expenses by July 17.

The amount that the accused paid herself did not exceed the amount to which she was then entitled for fees and expenses. According to Olson's own testimony, Olson had no objection "in principle" to the use of the CSD settlement money to pay the balance of the accused's fees.

## II.  PROCEDURAL ISSUES

As an initial matter, the accused argues that there were procedural defects in the present proceedings. We have

considered those arguments and conclude that they are not well taken. A detailed discussion of them would not benefit bench or bar.

## III. APPLICATION OF DISCIPLINARY RULES

### A. *Prompt Notification.*

*Former* DR 9-101(B)(1) requires a lawyer to notify the client promptly when he or she receives a client's funds:

"A lawyer shall:

"(1) Promptly notify a client of the receipt of the client's funds, securities or other properties."[1]

The Bar asserts that the accused violated that rule by failing promptly to notify Olson when the accused received either the CSD settlement check or the last four garnishment checks.

■ With respect to the CSD check, the accused and her former secretary testified that the secretary called Olson immediately and informed her that the check had arrived. We find that testimony credible and conclude that the Bar has not demonstrated a violation of *former* DR 9-101(B)(1) with respect to the CSD check.

■■ The accused also received five garnishment checks from Clair's employer that went toward satisfaction of the Clair judgment. Both the accused and Olson testified that the accused informed Olson promptly that she had received the first garnishment check. However, the accused failed to notify Olson *expressly* that she had received the other four garnishment returns. That failure violated the requirement of *former* DR 9-101(B)(1) that a lawyer "[p]romptly notify a client of the receipt of the client's funds." Even if a client expects the lawyer to receive funds on the client's behalf, the lawyer has an affirmative duty to notify the client promptly and expressly when the lawyer in fact receives the funds.

---

[1] Other portions of DR 9-101 were amended in 1992 and 1994 in ways not relevant to this opinion. *Former* DR 9-101(B)(1) was renumbered in 1993 as DR 9-101(C)(1), but the substance of the provision did not change. All references in this opinion to *former* DR 9-101(B)(1) are to the 1992 version of the rule.

## B. *Deposits to Trust Account.*

■   The Bar next alleges that the accused violated *former* DR 9-101(A) by failing to deposit client funds in her trust account. *Former* DR 9-101(A) provides:

> "All funds of clients paid to a lawyer or law firm, including advances for costs and expenses and escrow and other funds held by a lawyer or law firm for another in the course of work as lawyers, shall be deposited and maintained in one or more identifiable trust accounts in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

> "(1)   Funds reasonably sufficient to pay account charges may be deposited therein.

> "(2)   Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."[2]

The accused knowingly[3] deposited the last two garnishment checks that she received into her general business account, rather than into her trust account. Once deposited, she never transferred any portion of those funds into her trust account. The garnishment checks were in payment of the Clair judgment, which was a judgment in *Olson*'s favor,

---

[2] As noted earlier, other portions of DR 9-101 were amended in 1992 and 1994 in ways not relevant to this opinion. *Former* DR 9-101(A) was amended in 1993 in ways not relevant to this opinion. All references in this opinion to *former* DR 9-101(A) are to the 1992 version of the rule.

[3] This court has left open the question whether DR 9-101(A) (*formerly numbered* DR 9-102(A)) is a strict liability rule. *See In re Holman*, 297 Or 36, 58, 682 P2d 243 (1984) (so stating); *In re Mannis*, 295 Or 594, 596-97, 668 P2d 1224 (1983) (this court expressly declined to address whether the rule is a strict liability provision). The Bar relies on *Mannis* and *In re Phelps*, 306 Or 508, 512-13, 760 P2d 1331 (1988), to support its assertion that DR 9-101(A) is a strict liability offense. As noted, *Mannis* does not so hold. *Phelps* incorrectly states that *Mannis* holds that "failing properly to deposit or maintain funds in a trust fund is a 'strict liability' offense." In turn, *In re Whipple*, 320 Or 476, 479-80 n 8, 886 P2d 7 (1994), cites that sentence from *Phelps* and indicates that *Mannis* is the original source for that conclusion. We point out this history to emphasize that this court never has held that DR 9-101(A) is a strict liability offense. We also need not decide the question here, because we find that the accused acted knowingly.

and they were made payable only to Olson. That being so, when they arrived, the garnishment checks were "funds of [a] client[ ]" within the meaning of *former* DR 9-101(A). As funds of a client, the garnishment checks should have been "deposited * * * in one or more identifiable trust accounts." The accused's failure to deposit the proceeds from the last two garnishment checks into her trust account constitutes a violation of *former* DR 9-101(A).

## C. *Disbursements from Trust Account.*

■ The Bar asserts that the accused also violated *former* DR 9-101(A) by disbursing the proceeds from the last four garnishment checks and from the CSD settlement check without her client's knowledge or consent. To decide whether the accused disbursed the proceeds in violation of *former* DR 9-101(A), we must determine whether Olson and the accused agreed on how the proceeds would be disbursed.

Olson testified that she and the accused did not discuss what would happen with any garnishment checks other than the first one. By contrast, the accused testified that the parties orally agreed that funds recovered from the Clair judgment would go toward the accused's fees, until her bill was fully paid.

Based on the surrounding circumstances, we credit the accused's testimony, because we conclude that it is more plausible.[4] Although Olson stated that she and the accused did not discuss disbursement of garnishment checks other than the first one, she also testified that she understood that one-third of the proceeds of *each* check would go to the accused as part of her contingency fee *and* that part of the remainder would go toward the accused's legal fees for the custody matter. There was but *one* writ of continuing garnishment, and all the garnishment checks resulted from it.

---

[4] The trial panel found that the accused was not credible. This court gives weight to a trial panel's credibility finding even though the court reviews disciplinary cases *de novo. In re Trukositz,* 312 Or 621, 629, 825 P2d 1369 (1992). Nonetheless, in this case, we come to a different conclusion because of the factors discussed in the text. We also note that Olson's testimony contains inconsistencies and errors.

Olson's agreement in this regard also is a reasonable explanation for why the accused continued to provide legal services to her despite the fact that Olson owed the accused more than $5,200 and did not have the assets or income at the time to pay the bill.

We conclude that Olson agreed that the accused would disburse the proceeds from the garnishment checks to herself in payment of the fees and expenses owed.[5] Olson did not inform the accused that she no longer authorized this procedure until Olson's new lawyer wrote to the accused on July 15. The record does not show when the accused received that letter, but she answered it on July 17. The accused deposited the fifth and final garnishment check on July 16 (and, as noted above, she deposited that check improperly into her business account). There is not clear and convincing evidence that the accused had received the new lawyer's letter when she made that deposit[6] or that the amount disbursed to the accused from the garnishment proceeds exceeded what Olson had agreed to. Accordingly, the Bar has failed to prove that the accused violated *former* DR 9-101(A) by disbursing proceeds from the garnishment checks.[7]

As to disbursement of the CSD settlement check, the Bar alleges that the accused violated *former* DR 9-101(A) by

---

[5] The accused's giving Olson $50 from the garnishment proceeds on two occasions does not alter our conclusion because, although the accused was entitled to pay herself the entire amount, she could accept less.

[6] *See also* ORS 9.330, which provides:

"An attorney has authority to bind the attorney's client in any of the proceedings in an action, suit or proceeding, by the attorney and client agreement, filed with the clerk or entered in the appropriate record of the court. The attorney also has authority to receive money or property claimed by the client in an action, suit or proceeding, during the pendency thereof, or within three years after judgment or decree, and upon the payment or delivery thereof to discharge the claim or acknowledge satisfaction of the judgment or decree. This section does not prevent a party from employing a new attorney to issue execution upon a judgment or decree, or to take other proceedings prescribed by law for its enforcement, and when the party does so, the authority of the former attorney ceases."

[7] As noted above, because the garnishment checks were in payment of the Clair judgment, which was in Olson's favor alone, and were made payable only to Olson, they constituted client funds. The fact that Olson agreed to pay over the amount of those funds to the accused does not mean that the garnishment checks, when the accused received them, were not client funds to which the obligations of notification and initial deposit in the trust account applied.

disbursing the proceeds without Olson's knowledge or consent. A lawyer may not withdraw funds from a trust account knowing that there is a dispute over those funds. *See In re Spies*, 316 Or 530, 535, 852 P2d 831 (1993) (lawyer disciplined for withdrawing disputed funds from trust account).

The record shows that the parties disputed how a part of the $8,500 CSD check should be disbursed. As noted above, Olson and the accused discussed in "general terms" that the CSD check would be used to pay Olson's debt to the accused, and Olson had no objection "in principle" to the use of that money to pay the balance of the accused's fees. Nonetheless, Olson and the accused did not reach a meeting of the minds on what would happen to the entire $8,500.

Olson did not object to the accused's taking her 25 percent contingency fee and half the fee for the custody matter ($4,725) from the CSD check, nor did she object to the accused's payment of third parties from that check. *Former* DR 9-101(A)(2) allows a lawyer to withdraw funds owed to him or her if those funds are not in dispute. The accused did not violate *former* DR 9-101(A), therefore, by disbursing the foregoing amounts.

■ However, Olson did not agree as to what would happen to the remainder of the $8,500. The accused initially proposed, in writing, that Olson receive a portion of the $8,500 provided that Olson would agree to a specified schedule for payment of the balance of the fees that she owed to the accused. Olson notified the accused, in a telephone message, that she did not fully agree with the proposal. The accused did not discuss the disbursement of the CSD settlement check with Olson again. In those circumstances we conclude that the client disputed "the right of the [accused] * * * to receive" the remainder of the CSD check (beyond the contingency fee, half the fee for the custody matter, and the payments to third parties). *Former* DR 9-101(A)(2).

Under *former* DR 9-101(A), the accused was required to leave that disputed remainder in the trust account until the dispute was "finally resolved." By withdrawing the funds that were in dispute, the accused violated *former* DR 9-101(A).

■        The accused raises the attorney lien statute, ORS 87.430, as a defense. Although the accused may have had a lien respecting some or all of the disputed funds, the accused still was required to comply with the disciplinary rules that relate to collecting fees and maintaining funds in a trust account. The existence of a lien does not excuse a lawyer from complying with ethical requirements.

D.  *Dishonesty*.

        The Bar's final allegation is that the accused violated DR 1-102(A)(3), which provides:

> "It is professional misconduct for a lawyer to:
>
> "* * * * *
>
> "(3)   Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

The Bar asserts that the accused violated that rule by endorsing four garnishment checks without Olson's authority and by depositing and disbursing the proceeds of the four garnishment checks and the CSD settlement check without the client's authority.

        1.  *Endorsement of Checks*.

■        To determine whether the accused violated DR 1-102(A)(3) by endorsing the last four garnishment checks, we must determine whether the accused had the authority to endorse them. Olson claims that she gave the accused authority to sign only the first check and that the parties did not discuss what would be done with later checks. By contrast, the accused testified that Olson gave express authority to sign all the garnishment checks.

        Based on the surrounding circumstances, the accused's account is more plausible. Supporting that conclusion is Olson's implicit acceptance of the practice. As noted, after the accused received the first garnishment check, she sent Olson $50 from it, as the parties had agreed. After the accused received, endorsed, and deposited the second garnishment check, she sent Olson another $50. Olson accepted that money without telling the accused that this was not what the parties had agreed to.

Another circumstance suggesting that the parties had arranged for the accused to endorse subsequent checks was that Olson knew that checks would be coming in regularly. She testified that she expected the accused to receive "at least two [checks] a month."

Providing further support for our conclusion is the fact that the accused's endorsing the checks was more convenient for Olson. Olson testified that she had authorized the accused to endorse the first check because Olson was working at two jobs and "didn't have time to run downtown" to endorse it herself. The accused's former secretary also testified that Olson had authorized the accused to endorse the CSD settlement check. Because there were two incidents in which we have found that Olson expressly authorized the accused to endorse checks, and because it was more convenient for Olson at all relevant times to continue that practice, it is more plausible that she also expressly authorized the accused to endorse subsequent garnishment checks.

We find, in conclusion, that the Bar failed to prove by clear and convincing evidence that Olson did not authorize the accused to endorse the garnishment checks. Therefore, we find the accused not guilty of violating DR 1-102(A)(3) by endorsing them.

### 2. *Disbursement of Funds.*

Next, we consider whether the accused violated DR 1-102(A)(3) when she disbursed the proceeds from the last four garnishment returns and the CSD settlement check. Because we conclude that Olson had agreed that the proceeds from the garnishment would be used to pay the accused, we also conclude that the accused did not violate DR 1-102(A)(3) by disbursing a portion of those funds to herself.

As to the CSD settlement funds, the Bar alleges that the accused's unauthorized disbursement of the funds constituted fraud, deceit, misrepresentation, or dishonesty. This court has noted that fraud, deceit, dishonesty, and misrepresentation overlap but are not identical concepts. *See In re Hiller*, 298 Or 526, 533, 694 P2d 540 (1985) (so stating). "Fraud and deceit require, among other things, a false representation to another, with the intent that the other act

upon the false representation to his or her damage." *In re Hockett*, 303 Or 150, 158, 734 P2d 877 (1987). "Misrepresentation" occurs when a lawyer makes a false statement of a material fact or a nondisclosure of a material fact. *In re Leonard*, 308 Or 560, 569, 784 P2d 95 (1989). In the present case, there is no evidence that the accused made a false representation to another in disbursing the funds. Therefore, we conclude that her conduct did not involve fraud, deceit, or misrepresentation.

"Dishonesty" is conduct that indicates a " '[d]isposition to lie, cheat or defraud; untrustworthiness; lack of integrity.' " *Hockett*, 303 Or at 158 (citing *Black's Law Dictionary* 421 (5th ed 1979)). As this court noted in *In re Phelps*, 306 Or 508, 512, 760 P2d 1331 (1988), there is a difference between a charge of failing to maintain funds in a trust account under *former* DR 9-101(A) and dishonesty by misappropriation under DR 1-102(A)(3). "[R]emoval of money from a trust account does not necessarily constitute an intentional misappropriation." *Ibid.*

Our cases have not been entirely clear in describing when a removal of funds from a trust account in violation of *former* DR 9-101(A)(2) also violates DR 1-102(A)(3) by being dishonest. *Former* DR 9-101(A)(2) is more specific than is DR 1-102(A)(3) with respect to a lawyer's obligation to retain disputed fees in a trust account. That more specific rule implicitly assumes that the funds withdrawn are for payment of fees and expenses and that the client disputes the lawyer's right to receive the payment. Accordingly, dishonesty by misappropriation is not established merely by proving that a lawyer has withdrawn funds for the payment of the lawyer's previously earned fees and expenses, or that the client has not agreed to the withdrawal of funds for that purpose. That is, "self-help" to pay one's earned fees is not *per se* dishonest, even though it violates another disciplinary rule.

This court has not previously stated the foregoing rule in such stark terms. Our past cases, however, have implied it.

For example, in *In re Whipple*, 320 Or 476, 886 P2d 7 (1994), this court disbarred a lawyer for, among other things, converting clients' funds to his own use. With respect to two

of the clients, the accused argued that he had not violated DR 1-102(A)(3), because the amounts that he kept were for previously earned fees. 320 Or at 480-81, 483-85. Citing *Phelps*, this court stated that, to establish the alleged violations, "the Bar must demonstrate by clear and convincing evidence that the accused dishonestly and intentionally appropriated [the client's] money to his own use *before he had earned it*." *Id.* at 484-85 (emphasis added). With respect to one client, this court found "that the Bar has established by clear and convincing evidence that the accused violated DR 1-102(A)(3) (dishonesty) by intentionally appropriating [the client's] funds to his own use *when he knew that he had not yet earned the funds*." *Id.* at 481 (emphasis added). With respect to the other client, this court found the accused not guilty of dishonesty, because the Bar had failed to prove by clear and convincing evidence that the amount taken had *not* been earned as a fee. *Id.* at 484-85.

This court also disbarred a lawyer for converting clients' funds in *In re Thomas*, 294 Or 505, 659 P2d 960 (1983). The accused lawyer argued, in part, that he had withdrawn the clients' money and paid it to himself because he already had earned the money as attorney fees. 294 Or at 522. In rejecting that argument, this court implicitly accepted that such a state of facts, if true, would have meant that the acts of the accused were not dishonest. The court simply disagreed with the factual premise:

"The plain truth of the matter is that [the accused's] own documents * * * prove by clear and convincing evidence that approximately 90 percent of the fees were not earned when the last fees were withdrawn." *Id.* at 522-23.

Similarly, in *In re Binns*, 322 Or 584, 910 P2d 382 (1996), this court disbarred a lawyer for converting client funds and lying to the clients and to the Bar's investigators. The accused represented clients in connection with injuries that they had sustained in an automobile accident. A settlement was reached, and the accused placed the settlement funds in his trust account. Then the accused paid $2,500 of the clients' share of that settlement to another lawyer who had worked briefly on the case. 322 Or at 586-87. In concluding that the lawyer was dishonest, this court noted that the

clients had expressly rejected the $2,500 as being a proper fee. *Id.* at 592-95. Implicitly, had the $2,500 in fact been owed for past legal services, the act of paying it to the other lawyer would not have been dishonest, even if it violated another rule (such as the rule prohibiting the charging of an excessive fee).

In several other cases, this court concluded that a lawyer had violated DR 1-102(A)(3), as well as DR 9-101(A)(2), when the lawyer *either* took funds that were beyond previously earned fees *or* used a dishonest means to remove funds from a trust account. In *In re Holman*, 297 Or 36, 682 P2d 243 (1984), the accused obtained money that he was not entitled to receive as fees, and he did so in part by placing false entries in a register. In *In re Benjamin*, 312 Or 515, 823 P2d 413 (1991), the accused conceded that the money in his trust account belonged to his clients, but he drew checks against it for over $1,900 to pay office and residential rent. In *Phelps*, the accused drained the trust account with checks made out to himself, most of which were not in payment of fees and most of which contained no explanation of what they were for. In *In re Laury*, 300 Or 65, 706 P2d 935 (1985), the accused set aside $500 in cash, which was owed to and intended for his client, and then later spent the money for his own purposes.

In summary, our past cases suggest that a removal of funds from a trust account in violation of DR 9-101(A)(2) also is dishonesty under DR 1-102(A)(3) if either of two additional factors is present: the lawyer takes funds that are not already owed to the lawyer, or the lawyer uses a dishonest means to remove the funds. Here, the accused did not act dishonestly in the first of those two ways. That is, at the time she paid herself, the accused was in fact owed the money for legal services rendered.

The second issue is whether the accused acted dishonestly in the way in which she removed funds from the trust account. The Bar argues that the accused's methods were dishonest, because she lacked authority to endorse some of the checks that were placed into the trust account. In our discussion above, however, we have explained why we disagree with the Bar's factual premise.

With respect to the CSD check, the accused paid herself with funds from the trust account without Olson's agreement. She did so for the selfish purpose of being paid without awaiting the appropriate processes (such as fee arbitration or lien proceedings). But those facts do not add up to dishonesty. We conclude that the Bar has failed to prove that the accused violated DR 9-102(A)(3) as charged.

In summary, we conclude that the accused violated *former* DR 9-101(B)(1) by failing to notify Olson promptly when she received the last four garnishment checks, and that she violated *former* DR 9-101(A) by depositing the proceeds from two garnishment checks in her general business account rather than her trust account and by withdrawing client funds from her trust account while she and her client disputed to whom the funds belonged.

## IV. SANCTION

To determine the appropriate sanction, we consider the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 ed) (ABA Standards) and Oregon case law. *In re Morin*, 319 Or 547, 564, 878 P2d 393 (1994). The ABA Standards require analysis of the accused's conduct in the light of four factors: (1) the duty violated, (2) the accused's mental state, (3) the actual or potential injury, and (4) the existence of aggravating or mitigating circumstances. ABA Standard 3.0.

The accused violated the duty owed to her client by failing to preserve the client's property. ABA Standard 4.1. The violation occurred when she failed to notify Olson promptly when she received four garnishment returns, when she deposited two garnishment checks into her general business account, and when she withdrew from her trust account client funds that were in dispute.

The ABA Standards define "knowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 17. We find that the accused acted with knowledge in depositing two garnishment checks into her general business account and in

withdrawing disputed client funds from her trust account. We find that the accused acted negligently in failing to notify Olson promptly when she received four garnishment checks. *See* ABA Standards at 17 (defining "negligence").

The accused's failure to deposit two garnishment checks in her trust account and her withdrawal of disputed client funds from her trust account caused potential injury to her client because, in the event that the funds were determined not to belong to the accused, they would not readily have been available to the client.

We find several aggravating factors. First, the accused has substantial experience in the practice of law, having practiced almost nine years at the time of the rule violations at issue. ABA Standard 9.22(i). Second, as the accused herself recognized, the client was vulnerable, in part because she was threatened with losing custody of her child. ABA Standard 9.22(h). Third, the accused acted out of a selfish motive. ABA Standard 9.22(b). Although the accused earned the fees that are the subject of this proceeding, her manner of taking them was improper. Fourth, there are multiple offenses. ABA Standard 9.22(d).

A final aggravating factor is the accused's prior disciplinary offenses. ABA Standard 9.22(a). In 1989, the accused received a letter of admonition for violating DR 1-102(A)(4). In January 1995, she began an 18-month suspension after entering into a stipulation for discipline for violating DR 1-102(A)(3) and (4), DR 5-101(A), DR 7-106(A) and (C)(6), ORS 9.460(2), and ORS 9.527(3) and (4).

We conclude that we should give a moderate amount of weight to the prior discipline as an aggravating factor in this case. Some of the past misconduct was similar to conduct covered by the present proceeding. The past misconduct was very serious and extensive. Those factors suggest that we should give great weight to the prior discipline. On the other hand, the events giving rise to that stipulation occurred at roughly the same time as the events giving rise to the present proceeding, so the accused's acts herein do not reflect a disregard of an earlier adverse ethical determination. Therefore, the weight of the stipulation as an aggravating factor is

somewhat diminished. *See In re Jones*, 326 Or 195, 199-201, 951 P2d 149 (1997) (discussing prior disciplinary offenses as an aggravating factor).

Two mitigating factors also are present. The accused cooperated fully with the Bar's proceedings, for example, by stipulating to some of the facts in issue and by testifying voluntarily at the hearing. ABA Standard 9.32(e). The accused also participated in significant interim rehabilitation, such as by participating in the Oregon Attorney Assistance Program and by developing a working relationship with other lawyers to help her evaluate cases. ABA Standard 9.32(j).

The ABA Standards provide:

> "Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." ABA Standard 4.12.

We agree that suspension is appropriate in this case.

Many of the cases in which this court has found a violation of DR 9-101(A) also involved violations of other, more serious rules, including DR 1-102(A). The sanction imposed in those cases generally was disbarment. *See, e.g., In re Dickerson*, 322 Or 316, 905 P2d 1140 (1995) (lawyer disbarred for violating DR 9-101(A), DR 1-102(A)(3), and other rules); *Whipple*, 320 Or 476 (same); *Spies*, 316 Or 530 (same).

At the other end of the spectrum is *In re Williams*, 314 Or 530, 840 P2d 1280 (1992), in which this court suspended the accused for 63 days. In that case, the accused represented that he would hold certain client funds in his trust account pending the resolution of a dispute. He failed to do so, however, even though he believed that he would at the time he made the representation. This court found the accused guilty of violating DR 9-101(A) and other rules. Aggravating and mitigating factors also were present, but the accused did not have a prior disciplinary record.

The case most similar to the one before us is *In re Boothe*, 303 Or 643, 740 P2d 785 (1987), in which this court imposed a six-month suspension on a lawyer who failed to account for property of a client (*former* DR 9-102(B)(3)), failed

promptly to pay over client funds to which the client was entitled (*former* DR 9-102(B)(4)), engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation (DR 1-102(A)(4)), engaged in conduct prejudicial to the administration of justice (DR 1-102(A)(5)), and mishandled funds belonging in part to the lawyer and in part to the client (DR 9-102(A)). 303 Or at 645. In that case, the lawyer endorsed his client's name to a check without authority and withdrew several thousand dollars from trust for attorney fees in anticipation of a fee dispute. We believe that the accused should receive the same sanction that this court imposed in *Boothe*.

The accused is suspended from the practice of law for a period of six months commencing on the effective date of this decision.

**GILLETTE, J.,** concurring in part and specially concurring in part.

I join in much of what the majority has to say concerning what the accused did and what disciplinary rules were violated as a result of the accused's actions. However, because I cannot agree with the majority with respect to the question whether the accused's resort to "self-help," by disbursing to herself a portion of the CSD settlement check in the accused's trust account, involved "dishonesty," I cannot join that part of the majority opinion that finds the accused not guilty of dishonesty under DR 1-102(A)(3).

The majority today holds specifically that " 'self-help' to pay one's earned fees is not *per se* dishonest, even though it violates another disciplinary rule." 326 Or at 343. The majority assures us that this is not a new rule, however. Instead, that rule is deemed to have been implicit in a long line of cases, none of which ever involved the need to express it. With respect, I do not agree that the majority's rule is one that this court is required to extract from the cases on which it relies. Instead, each of those cases reached the individual conclusion that it reached because the actions of the accused in those cases were in some way different or more aggravated forms of self-help than the form utilized by the accused in the present case. Neither do I agree that it follows, as the majority seems to feel that it does, that, if the actions of the accused

lawyers in those earlier cases had been *less* aggravated, they would have been found not guilty.

The only case that appears to support the majority's view directly is *In re Whipple*, 320 Or 476, 886 P2d 7 (1994). In that case, a lawyer had exercised self-help in order to obtain disputed funds belonging to two different clients. The accused maintained that he had earned all that he took. This court disagreed with respect to one of the two clients, and found the accused guilty of dishonesty under DR 1-102(A)(3). 320 Or at 481. With respect to the other client, however, this court found the accused not guilty of dishonesty under the rule because, as the majority describes the case, "the Bar had failed to prove by clear and convincing evidence that the amount taken had *not* been earned as a fee." 326 Or at 344 (emphasis in original).

It is true that the court at one point in *Whipple* discussed the issue of dishonesty under DR 1-102(A)(3) as if the only way to demonstrate dishonesty would be to show that the accused had "dishonestly and intentionally appropriated [the client's] money to his own use before he had earned it." 320 Or at 485. I give little weight to that statement, however, because, so far as I can determine, the Bar never argued in the alternative that the accused *could* be guilty of dishonesty on any other theory than that the fees were unearned. In my mind, that issue still should be an open one.

Returning to the facts of the present case, the majority very vividly sums up the accused's behavior with respect to part of the CSD settlement check as follows:

> "With respect to the CSD check, the accused paid herself with funds from the trust account without Olson's agreement. She did so for the selfish purpose of being paid without awaiting the appropriate processes (such as fee arbitration or lien proceedings)."

326 Or at 346. The majority today nonetheless concludes that such a "selfish" act is not "dishonest." With respect, one could advance that proposition to anyone outside our profession only with the expectation that the hearer would say, "That is a distinction that would fool only a lawyer." Certainly, it should not fool this court, particularly when this court has

defined "dishonesty" as being, among other things, a "lack of integrity." *In re Hockett*, 303 Or 150, 158, 734 P2d 877 (1987). Where is the "integrity" in a lawyer's sacrificing her client's interest in favor of her own?

I would hold that the accused had no good faith claim that the trust account funds *belonged* to her, merely because she had performed services for Olson. Taking the funds was a dishonest act. It follows that I view the accused's conduct in a far more serious light than does the majority.[1]

Van Hoomissen and Durham, JJ., join in this separate opinion.

---

[1] It appears from the briefs in this and other cases that the Bar traditionally has felt constrained by *Whipple* from arguing that the removal of *earned* fees from a trust account in circumstances like the present case constituted "dishonesty." To take the generous (for the accused) approach, I would be content even if the view that I espouse were to be adopted *prospectively only*. This case was our chance to correct a misunderstanding and to protect clients. Sadly, we've missed it.