Argued and submitted May 11, resubmitted May 27, accused disbarred August 11, 1994

In re Complaint as to the Conduct of
## VOLNEY F. MORIN, JR.,
*Accused.*

(OSB 92-72; SC S40995)

878 P2d 393

Michael Jewett, Medford, argued the cause and filed the brief for the accused.

Mary A. Cooper, Assistant Disciplinary Counsel, argued the cause and filed the response for the Oregon State Bar.

PER CURIAM

## PER CURIAM

This is a disciplinary proceeding brought by the Oregon State Bar, alleging violations of the Code of Professional Responsibility and a statutory violation. The accused was charged with violating: DR 1-102(A)(3) (misconduct involving dishonesty, fraud, deceit, or misrepresentation); *former* DR 7-102(A)(5) (1989) (knowingly making a false statement in the representation of a client); *former* DR 7-102(A)(6) (1989) (participating in the creation or preservation of false evidence in the representation of a client); *former* DR 7-102(A)(8) (1989) (knowingly engaging in illegal conduct or conduct contrary to a disciplinary rule in the representation of a client); ORS 9.527(4) (willful deceit or misconduct in the legal profession); DR 1-103(C) (failing to respond fully and truthfully to the Bar); DR 1-102(A)(2) (committing a criminal act that reflects adversely upon the lawyer's honesty, trustworthiness, or fitness to practice law); DR 2-106(A) (charging or collecting an illegal or clearly excessive fee); DR 1-102(A)(2) (set forth above); and DR 3-101(A) (aiding a nonlawyer in the unlawful practice of law).

The trial panel found that the accused violated all the charged provisions and recommended disbarment. We review *de novo*. ORS 9.536(3). We find that the accused committed seven of the 10 charged violations and order that he be disbarred.

The facts relating to this case are undisputed. The accused was licensed to practice law in California in 1974 and was admitted to practice law in Oregon in 1984. During the spring of 1988, the accused began conducting "living trust" seminars and selling "living trust packages," which included pour-over wills and directives to physicians.

The accused and two of his employees, who were paralegals, travelled throughout Oregon and northern California, conducting seminars and preparing the living trust packages. If a person at a seminar indicated that he or she was interested in discussing a living trust package, the accused or one of the paralegals would make an appointment and return to meet with the client. The accused or the paralegal would gather information from the client and then prepare the

documents for the living trust package in the accused's Medford office.

At trial, Monnett, a paralegal employed by the accused, testified that he usually travelled alone, conducted seminars before groups, collected information from prospective clients, and assisted clients in executing the documents contained in the trust packages. He testified that the questions that he answered at the seminars were general and did not apply to individual clients' problems.

Monnett also testified that, during meetings with individual clients, he read their wills and explained to them the operative parts of the will. He also testified that he inquired into the clients' assets and advised them whether or not they needed a trust.[1] He reviewed the trusts and other legal documents with the clients. Some of the clients never met the accused and dealt only with Monnett throughout the process. Both Monnett and the other paralegal employed by the accused, Pesterfield, testified that the accused instructed them to call him if they had legal questions. Both also testified that they believed that the accused reviewed all the documents that were prepared because he signed all of them and because occasionally he discussed the contents of the documents with Monnett.

Ordinarily, after the documents were prepared, the accused or one of the paralegals scheduled an additional appointment with the client to execute the documents. Two of the documents required the signatures of two witnesses to be valid — the pour-over will[2] and the directive to physicians.[3]

---

[1] Monnett testified that he also advised clients that some other pre-prepared trusts were not very useful because the other trusts "didn't do much."

[2] ORS 112.235 provides, in part:

"(1) The testator, in the presence of each of the witnesses, shall:

"(a) Sign the will; or

"(b) Direct one of the witnesses or some other person to sign thereon the name of the testator; or

"(c) Acknowledge the signature previously made on the will by the testator or at the testator's direction.

"* * * * *

"(3) At least two witnesses shall each:

"(a) See the testator sign the will; or

On the pour-over will, the language immediately preceding the witnesses' signatures provided:

> "The foregoing instrument was, on the date above written, signed and declared by the Testatrix[or] to be her [or his] Last Will and Testament in the presence of us, who at her [or his] request and in her [or his] presence and in the presence of each other, have hereunto subscribed our names as witnesses and we hereby certify that we believe the Testatrix[or] to be of sound mind and memory and under no undue influence."

Just below the signatures of the witnesses, the following jurat appeared:

"STATE OF OREGON      )
"County of [county name]    )

> "Subscribed, sworn to and acknowledged before me by [name of testatrix or testator], Testatrix[or], and subscribed and sworn to before me by [names of witnesses], witnesses, this [date].

> "Signature
> Notary Public for Oregon
> My Commission Expires:"

On the directives to physicians, the language immediately preceding the place for witness signatures on the directive to physicians provided:

> "(1)  I personally know the Declarant and believe the Declarant to be of sound mind.

> "* * * * *

> "(3)  I understand that if I have not witnessed this Directive in good faith I may be responsible for any damages that arise out of giving this Directive its intended effect."

The accused testified that clients in the Medford and Ashland area ordinarily executed the documents in the living trust packages in the accused's office, where the accused's office staff members served as witnesses. When the accused or the paralegals executed documents at seminar sites, however,

---

> "(b)  Hear the testator acknowledge the signature on the will; and

> "(c)  Attest the will by signing the witness' name to it."

  [3] *Former* ORS 127.610 (2) (1989) provided that a directive to physicians "is only valid if signed by the declarant in the presence of two attesting witnesses."

it was difficult for them to have the wills and directives to physicians witnessed.

The accused and the paralegals began a practice of taking the wills and directives to physicians back to the accused's office in Medford after they were signed by the clients at the seminar sites and directing the office staff to sign the documents as witnesses. The signatures of the "witnesses" on the wills were notarized either by the accused or by one of his employees. The signatures on the directives to physicians were not notarized. The accused then mailed the signature pages back to the clients.

In July 1990, the accused received a letter from a lawyer questioning whether the will of one of the accused's clients, Shumway, had been witnessed properly. In response, the accused did not change the practice of "witnessing" outside the presence of the client but changed the form letter that was sent to clients to delete the reference to how his office staff had witnessed the will outside the client's presence. In January 1992, the accused received another letter about the Shumway will from the same lawyer. In response, the accused admitted that he had caused Shumway to sign her will and later to have it witnessed by people who were not present at the time the documents were executed.

The accused sent a copy of the lawyer's letter and a copy of his response to the Oregon State Bar. The Bar wrote to the accused, asking him to respond to the allegations made by the other lawyer. The accused responded, stating, among other things: "I refute categorically, [the lawyer's] contention that the practice followed in the case of the Shumways is a 'common occurrence' in [my] practice. I made an exception in the case of the Shumways which I admit was a mistake."

The Bar assigned the matter to the Local Professional Responsibility Committee (LPRC) for investigation. Both the accused and his secretary denied to the LPRC investigator that the accused's conduct with regard to the Shumway will was part of a larger pattern. They both stated that the improper witnessing of the Shumway will had been a one-time occurrence. Following the investigation, the State Professional Responsibility Board (SPRB) authorized formal charges regarding the Shumway matter. In his answer, the

accused stated that "[t]his mistake was an isolated incident and I have made a full disclosure of all relevant facts to the representatives of the Oregon State Bar Association [*sic*]."

Just before the originally scheduled disciplinary trial, the accused's secretary, who was no longer employed by the accused, admitted that she had lied to the LPRC investigator and that she had "witnessed" many wills and directives to physicians in the same manner as the Shumway will. The trial was continued, and the Bar filed an Amended Complaint, alleging several new disciplinary violations. In the accused's second amended answer, the accused admitted that he had caused the wills and directives to physicians of approximately 300 clients to be executed outside the presence of the witnesses, who later signed the wills and directives to physicians.

The accused stated before the trial panel that he knew that a will is invalid unless it is either executed or affirmed by the testator in the presence of two witnesses. He also testified that part of the fee he charged his clients was for a valid will and that he understood that his clients believed that they were receiving valid wills as part of the living trust packages.

In December 1993, the trial panel found that the accused had violated all the charges alleged in the Bar's amended formal complaint. We consider each cause of complaint in turn.

## FIRST AND SECOND CAUSES OF COMPLAINT

In its first and second causes of complaint,[4] the Bar alleges that the accused committed four disciplinary rule violations and a statutory violation.

### 1. *Dishonesty, Fraud, Deceit, or Misrepresentation*

DR 1-102(A)(3) provides:

"(A) It is professional misconduct for a lawyer to:

"* * * * *

---

[4] The first and second causes of complaint charge violations of the same disciplinary rules. The first cause of complaint alleges the improper witnessing of the Shumway will. The second cause of complaint alleges improper witnessing of "approximately 300 living trusts." Because those allegations refer to identical conduct on behalf of different clients, the trial panel addressed the first two causes of complaint together, and so shall we.

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

The accused admits that he knew that the Shumway will and approximately 290 others were invalid at the time that the clients executed them because they were improperly witnessed. He also admits that he knew that his clients thought that the wills were valid. The accused failed to correct that misapprehension of material fact. Failure to disclose a material fact may be misrepresentation for the purposes of DR 1-102(A)(3). *See In re Hedrick*, 312 Or 442, 446, 822 P2d 1187 (1991) (violation of DR 1-102(A)(3) when accused failed to disclose that the will he offered for probate had been revoked by a subsequent will).

Moreover, the accused solicited members of his staff to sign wills that falsely stated that the clients had signed the wills in staff members' presence. In addition, the accused notarized wills, each of which contained a jurat that provided that the will was subscribed and sworn before him by both the testator and the witness on a particular date. That statement also was false. *See In re Benson*, 311 Or 473, 478, 814 P2d 507 (1991) (recording a forged and falsely notarized deed violated *former* DR 1-102(A)(4) (current DR 1-102(A)(3))); *In re Kraus*, 289 Or 661, 667-71, 616 P2d 1173 (1980) (court suspended lawyer who notarized document signed outside his presence).

The accused engaged in a pattern of conduct designed to deceive both his clients and subsequent readers of the wills and directives to physicians. Accordingly, we find that the accused engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation." The accused violated DR 1-102(A)(3). *See In re Purvis*, 308 Or 451, 457-58, 781 P2d 850 (1989) (accused violated *former* DR 1-102(A)(4) (current DR 1-103(A)(3)) when he misrepresented to a client the progress of his case).

2. *False Statement; False Evidence; Illegal Conduct*

In 1989, when the accused prepared and executed the Shumway will, DR 7-102(A) (1989) provided, in part:

"In the lawyer's representation of a client, a lawyer shall not:

"* * * * *

"(5) Knowingly make a false statement of law or fact.

"* * * * *

"(6) Participate in the creation or preservation of evidence when the lawyer knows or it is obvious that the evidence is false.

"* * * * *

"(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."

The trial panel concluded that the accused had violated DR 7-102(A)(5), (6), and (8).

DR 7-102(A) was amended, effective January 1991, to include conduct occurring "in representing the lawyer's own interests" as well as conduct occurring "[i]n the lawyer's representation of a client." The Shumway will was improperly witnessed in 1989, and the Bar does not offer evidence that any of the other improperly witnessed documents were executed after January 1991. Thus, the pre-1991 version of DR 7-102(A) applies in this proceeding.

Before the 1991 amendment, DR 7-102(A) was prefaced with the phrase "[i]n the lawyer's representation of a client." There are conflicting precedents for the meaning of that phrase. This court has held that the pre-1991 version of DR 7-102(A) "concerns conduct a lawyer might use to advance the interests of a client." *In re Willer*, 303 Or 241, 244, 735 P2d 594 (1987). In *Willer*, the accused submitted litigation reports to a client that were misleading as to the status of legal matters that the accused had worked on for the client. *Id.* at 243. The court held that DR 7-102(A)(5) did not apply to that case because "the conduct of the accused was not taken to advance the interests of the client." *Id.* at 244. *See also In re Coe*, 302 Or 553, 567-68, 731 P2d 1028 (1987) (accused did not violate DR 7-102(A)(8) because dishonest conduct was to advance his own interests to the detriment of the client); *but see In re Dixson*, 305 Or 83, 89, 750 P2d 157 (1988) (accused violated DR 7-102(A)(5) when he made false statements about the status of his client's case to the court, the Bar, and his client; no mention of the issue raised in *Coe* and *Willer*); *In re Kissling*, 303 Or 638, 640-41, 740 P2d 179 (1987) (accused violated DR 7-102(A)(5) when he told his

client that action was pending when it was not; no mention of the issue raised in *Coe* and *Willer*).

We do not decide whether the misconduct in which the accused engaged violated the provisions of DR 7-102(A). The accused's acts of misconduct in misleading his clients, in causing his staff to falsely witness documents, and in improperly notarizing wills constituted violations of DR 1-102(A)(2), DR 1-102(A)(3), DR 2-106(A), and ORS 9.527(4). Due to the sanction imposed, the fact that the same conduct also may have violated DR 7-102(A) is of no moment.[5] *See In re Recker*, 309 Or 633, 638 & n 4, 789 P2d 663 (1990) (recognized conflict in precedent and declined to decide whether DR 7-102(A) applied to case where the accused misled court to advance her own interests because the misconduct was a violation of DR 1-102(A)(3) and the sanction would not be enhanced if it also was a violation of DR 7-102(A)(5)).

### 3. *Willful Deceit or Misconduct*

ORS 9.527 provides, in part:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"* * * * *

"(4)   The member is guilty of willful deceit or misconduct in the legal profession."

As discussed above, the accused led his clients to believe that he had prepared valid wills and directives to physicians as part of the living trust packages. He knew that those documents were not valid if they were not properly witnessed, and he caused them to be improperly witnessed. The accused willfully deceived nearly 300 clients; he violated ORS 9.527(4). *See, e.g., In re Fuller*, 284 Or 273, 278, 586 P2d 1111 (1978) (accused violated *former* ORS 9.480(4) (earlier version of ORS 9.527(4)) when he represented to clients that he filed an action when he had not done so, made false representations to opposing lawyer, and failed to inform clients that he had settled case).

---

[5] Moreover, because the disciplinary rule was amended in 1991 to deal with this issue, it would be of little benefit to bench or Bar to decide this issue here.

## THIRD CAUSE OF COMPLAINT

DR 1-103(C) provides:

"A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

The accused does not dispute that he failed to respond fully and truthfully to the Bar inquiry, in violation of DR 1-103(C). The accused informed the Bar at the outset of the investigation that he had caused the Shumway will to be improperly witnessed. On three occasions, however, the accused stated to representatives of the Bar that the improper witnessing of the Shumway will was a mistake and "an isolated incident." It was not until after the accused's former secretary told the Bar that she had lied to the LPRC investigator and that in fact she had improperly witnessed many wills, that the accused admitted to the Bar that he had caused approximately 300 other wills and directives to physicians to be improperly witnessed. We conclude that the accused violated DR 1-103(C).

## FOURTH CAUSE OF COMPLAINT

1. *Criminal Conduct*

DR 1-102(A)(2) provides:

"(A)   It is professional misconduct for a lawyer to:

"* * * * *

"(2)   Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law."

The trial panel concluded that the accused violated DR 1-102(A)(2) because he committed theft by deception, as defined in ORS 164.085.[6] The accused offers two reasons why

---

[6] ORS 164.085 provides, in part:

"(1) A person, who obtains property of another thereby, commits theft by deception when, with intent to defraud, the person:

"(a) Creates or confirms another's false impression of law, value, intention or other state of mind which the actor does not believe to be true; or

he did not commit the crime of theft by deception. He first argues that the "true value of the overall package was virtually unaffected by invalidity of the will" because, "if properly funded and updated, the trust would eliminate the need to probate the will at all." Presumably, the accused is arguing that his misrepresentations had "no pecuniary significance" and that, therefore, there was no deception under ORS 164.085. That argument is not persuasive. The accused ordinarily charged his clients between $900 and $1500 for a living trust package. That package included both the pour-over will and the directive to physicians. The accused stated before the trial panel that the fee for the package included a fee for a valid will. As part of the total package, therefore, the will and the directive to physicians had some pecuniary value attached to them, regardless of whether or not the will ever was admitted to probate. The accused intentionally did not provide 290 clients with the full services for which they paid. Thus, the accused committed "deception" for the purposes of ORS 164.085.

Second, the accused argues that he did not have the necessary intent to have committed the crime of theft by deception. The statute provides the following definition:

" 'Intentionally' or 'with intent,' when used with respect to a result or to conduct described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described." ORS 161.085(7).

The accused argues that he did not intend "to enrich himself by cold-bloodedly deceiving clients," but that his mental state was one of "egregious inattentiveness." We are not persuaded. The accused did not just "let things slip" while he was going through a period of crisis in his life. The accused affirmatively directed members of his office staff to

---

"(b) Fails to correct a false impression which the person previously created or confirmed; or

"* * * * *

"(e) Promises performance which the person does not intend to perform or knows will not be performed.

"(2) 'Deception' does not include falsity as to matters having no pecuniary significance, or representations unlikely to deceive ordinary persons in the group addressed."

falsely witness documents after the documents were executed. He consciously led his clients to believe that the wills and directives to physicians that had been executed as part of the package would have legal significance. The accused knew that the wills were invalid and, therefore, worthless, at best, and he continued charging the full price for the package without either notifying his clients of the invalidity of the wills and directives to physicians or discounting the package for the invalid parts. The Bar met its burden to show by clear and convincing evidence that the accused committed the crime of theft by deception, and thus, that the accused violated DR 1-102(A)(2). *See In re Anson*, 302 Or 446, 453-54, 730 P2d 1229 (1986) (under *former* DR 1-102(A)(3), it is not necessary for the accused to be convicted of a crime; clear and convincing evidence meets Bar's burden).

### 2. *Excessive Fee*

DR 2-106(A) provides: "A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee."

The trial panel found that the accused violated DR 2-106(A) because "there can be no question but that a fee is excessive when it includes charges for documents which are known to be invalid." We agree with the trial panel's determination. In *In re Gastineau*, 317 Or 545, 551, 857 P2d 136 (1993), this court held that "a lawyer violates DR 2-106(A) when he or she collects a nonrefundable fee, does not perform or complete the professional representation for which the fee was paid, but fails promptly to remit the unearned portion of the fee."

Here, the accused charged his clients a fee for the performance of certain services, including the preparation and execution of a *valid* will and a *valid* directive to physicians. The accused intentionally failed to provide his clients with the valid documents for which they had paid. The accused intentionally charged clients for services that he knew he would not provide.[7] Accordingly, the fee was excessive and the accused violated DR 2-106(A). *See also In re Thomas*, 294 Or 505, 526, 659 P2d 960 (1983) ("It would

---

[7] The accused refunded the fee to Shumway but not to each of the other 290 clients whom the accused charged for an invalid will and directive to physicians.

appear that any fee that is collected for services that is not earned is clearly excessive regardless of the amount.").

## FIFTH CAUSE OF COMPLAINT

The trial panel found that the accused also violated DR 1-102(A)(2) (committing a criminal act that reflects adversely upon the lawyer's honesty, trustworthiness, or fitness to practice law) (set forth *supra*) because he committed the crimes of solicitation, ORS 161.435,[8] and false swearing, ORS 162.075.[9] ORS 161.155[10] makes a person criminally liable for the acts of another person if he or she solicits or commands the other person to commit the crime. The Bar argues that the accused directed his staff members to commit the crime of false swearing and that, therefore, the accused committed the crimes of false swearing and solicitation.

The accused argues that his employees and, therefore, that he, did not commit the crime of false swearing because they did not make any "sworn statements." ORS 162.055(4) defines sworn statement to mean "any statement knowingly given under any form of oath or affirmation attesting to the truth of what is stated." Although the accused's employees may not have raised their hands in a formal oath, they signed a statement on the wills that said: "we hereby certify that we believe the Testatrix[or] to be of sound mind and memory and under no undue influence."

---

[8] ORS 161.435(1) provides:

"A person commits the crime of solicitation if with the intent of causing another to engage in specific conduct constituting a crime punishable as a felony or as a Class A misdemeanor * * * the person commands or solicits such other person to engage in that conduct."

[9] ORS 162.075 provides:

"(1) A person commits the crime of false swearing if the person makes a false sworn statement, knowing it to be false.

"(2) False swearing is a Class A misdemeanor."

[10] ORS 161.155 provides, in part:

"A person is criminally liable for the conduct of another person constituting a crime if:

"* * * * *

"(2) With the intent to promote or facilitate the commission of the crime the person:

"(a) Solicits or commands such other person to commit the crime[.]"

Just below the signatures of the witnesses on the wills, the following jurat appeared: "Subscribed, sworn to and acknowledged before me by [name of testatrix or testator], Testatrix[or], and subscribed and sworn to before me by [names of witnesses], witnesses, this [date]."[11] The accused's employees signed wills that certified the truth of the statement and were notarized by the accused or some other notary. The witnesses' statement said that they "certified" that the testator was of sound mind and memory and under no undue influence. Moreover, the jurat and notary seal and signature were intended to ensure that the witnesses (and testator) signed the will in good faith. The purpose of those precautions is to attest to the truth of the information that is stated in the will and in the witness statement. That is an oath or affirmation for the purposes of ORS 162.055(4) and 162.075(1). *See State v. Carr*, 319 Or 408, 413, 877 P2d 1192 (1994) (for the purposes of the perjury statute, a statement was sworn when "the statement was a vow of the person making the statement and * * * the vow was made in the presence of the notary").

On nearly 300 documents, the accused's employees made an oath or affirmation that attested to the truth of a document that stated that the testator had signed in their presence. The employees were not present when the clients signed the documents. Therefore, the accused's employees committed the crime of false swearing. The accused admits that his staff members' attestations were made at his behest. Accordingly, we find by clear and convincing evidence that the accused violated DR 1-102(A)(2) when he committed the crime of solicitation, ORS 161.435, and false swearing, ORS 162.075(1), through operation of ORS 161.155.

SIXTH CAUSE OF COMPLAINT

DR 3-101(A) provides: "A lawyer shall not aid a nonlawyer in the unlawful practice of law."

The trial panel concluded that the accused assisted nonlawyers in the unlawful practice of law in violation of DR 3-101(A) when he employed paralegals to assist him in preparing living trust packages.

---

[11] The accused himself notarized the Shumway will and some of the others.

■.　　There is insufficient evidence for us to conclude that the paralegals engaged in the unlawful practice of law by giving the seminars on living trusts and by answering general questions about the living trust packages. Disseminating information that is "directed to the general public and not to a specific individual" is not the practice of law. *Oregon State Bar v. Gilchrist*, 272 Or 552, 558, 538 P2d 913 (1975). Apparently, the seminars and questions answered by the paralegals in the seminars went to general information about the advantages of living trusts and about the contents of the packages. The dissemination of that information did not involve the practice of law.

It appears, however, that at least Monnett went beyond the mere dissemination of general information to the public. The Bar alleges that it was Monnett's interactions with individuals that constituted the practice of law. In *Gilchrist*, this court held that advertising and selling do-it-yourself divorce kits did not constitute the practice of law. 272 Or at 557-60. This court also held, however:

"[A]ll personal contact between defendants and their customers in the nature of consultation, explanation, recommendation or advice or other assistance in selecting particular forms, in filling out any part of the forms, or suggesting or advising how the forms should be used in solving the particular customer's marital problems does constitute the practice of law * * *." *Id.* at 563-64.

This court set forth the test for ascertaining what conduct constitutes the practice of law in *State Bar v. Security Escrows, Inc.*, 233 Or 80, 89, 377 P2d 334 (1962): "[T]he practice of law includes the drafting or selection of documents and the giving of advice in regard thereto any time an informed or trained discretion must be exercised in the selection or drafting of a document to meet the needs of the persons being served."

In *State Bar v. Miller & Co.*, 235 Or 341, 347, 385 P2d 181 (1963), this court held that an insurance salesperson that assisted people in preparing estate plans could

"explain to his prospective customer alternative methods of disposing of assets * * * which are available to taxpayers *generally*. * * * He cannot properly advise a prospective purchaser with respect to his *specific* need for life insurance

as against some other form of disposition of his estate, unless the advice can be given without drawing upon the law to explain the basis for making the choice of alternatives." (Emphasis in original.)

In this case, Monnett examined wills and interpreted them for clients of the accused. Moreover, Monnett discussed clients' individual assets with them to determine whether a living trust would be an appropriate device for the particular client to use. Monnett also told the accused's clients his opinion of the usefulness of another trust format, telling them that it "didn't do much." In short, Monnett advised clients and potential clients of the accused on legal decisions specific to them, and he used discretion in selecting between using a trust and a will and among trust forms. Accordingly, Monnett, a nonlawyer, practiced law.

The accused argues that, even if Monnett practiced law, he did not assist Monnett. He argues that he "took pains to tell these paralegals not to practice law at the seminars." He also told them to call him at the office or at home "[i]f any legal questions arose." Furthermore, the accused argues that he did not know of Monnett's conduct nor did he aid in that conduct; therefore, he did not violate the rule.

This court's decision in *In re Jones*, 308 Or 306, 779 P2d 1016 (1989), is instructive. In that case, the accused allowed a nonlawyer to use pleading paper and a letterhead stamp with the lawyer's name on it in the nonlawyer's dissolution-processing business. 308 Or at 308. The accused knew that the nonlawyer had been warned by the Bar not to practice law. *Id*. at 309. The accused instructed her to bring any legal questions that she had to him. *Id*. This court held that the accused aided a nonlawyer in the practice of law because he "took no steps to enforce his instruction or to test her ability to determine when legal help was needed." *Id*. This court also found it to be important that the clients were never required to speak with the accused. *Id*.

Here, as in *Jones*, although the accused told his paralegals not to practice law, he did not tell them the precise contours of what constituted the practice of law. Moreover, the accused created the situation in which at least one of his paralegals had the opportunity to practice law. The accused sent the paralegals to meet with clients alone, and he failed to

supervise them properly. Thus, even if the accused did not intend for the paralegals to practice law, he assisted in that unlawful practice by allowing them too much freedom in dealing with clients, thereby allowing at least Monnett to provide legal advice to those clients. Accordingly, we conclude that the accused assisted in the unlawful practice of law in violation of DR 3-101(A).

## SANCTIONS

We now turn to the appropriate sanction for the accused's proven misconduct. We look for guidance to the American Bar Association Standards for Imposing Lawyer Sanctions (1991) [ABA Standards] and to prior decisions of this court. *See In re Cohen*, 316 Or 657, 663, 853 P2d 286 (1993) (referring to ABA Standards for guidance). Under the ABA Standards, we consider: (1) the duty violated; (2) the lawyer's mental state; (3) the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. ABA Standard 3.0.

First, the accused violated his duty to his clients to be candid. ABA Standard 4.6. He also violated his duty to the public to maintain personal integrity. ABA Standard 5.1. The accused also violated his duty to the Bar by lying to representatives of the Bar on three occasions. ABA Standard 7.0.

Second, in respect of most of the misconduct, the accused acted intentionally. "An act is 'intentional' if it is done with conscious objective or purpose to accomplish a particular result." *In re Williams*, 314 Or 530, 546, 840 P2d 1280 (1992). The accused intentionally deceived nearly 300 clients into believing that they were receiving valid wills and directives to physicians when he knew that the documents were invalid. The accused also intentionally lied to the Bar by telling its investigators on three separate occasions that the Shumway will was an isolated incident, when in fact he had caused nearly 300 other wills to be improperly witnessed.

In respect of the aiding in the unlawful practice of law violation, however, the accused acted only negligently in failing to properly supervise and instruct the paralegals.

Third, as a result of the accused's misconduct, nearly 300 clients were left with invalid wills and directives to

physicians that they incorrectly believed to be valid. The potential for harm was great. Although it is unknown whether any court or physician has been misled by the invalid documents prepared by the accused or whether any of the accused's clients died intestate, the accused's conduct created the potential for a great deal of harm.[12] Moreover, the accused seriously impeded the Bar investigation by lying to the investigators on three different occasions.

Fourth, in mitigation, the accused has had no other disciplinary complaints against him. ABA Standard 9.32(a). In addition, his remorse for his violations seems genuine now.[13] ABA Standard 9.32(l). The accused also argues that he had serious family problems that influenced his actions. ABA Standard 9.32(c). Even if we were to accept that the accused did suffer such problems, it does not matter here because the accused did not act negligently; he engaged in a pattern of intentional deception and misconduct.

There also are several factors in aggravation. The accused was acting out of a selfish and dishonest motive — cutting corners to increase profit and deceiving his clients into believing that they were receiving, among other things, a valid will and directive to physicians. ABA Standard 9.22(b). The accused's conduct involved a pattern of misconduct and many disciplinary offenses, consisting of nearly 300 separate acts of deception. ABA Standard 9.22(c) and (d). In addition, the accused on three occasions was untruthful during the Bar's investigation. ABA Standard 9.22(f).

The ABA Standards indicate that the accused should be disbarred. *See* ABA Standard 4.61 (disbarment generally appropriate when lawyer knowingly deceives client to benefit himself and causes serious injury or potentially serious injury to a client); ABA Standard 5.11 (disbarment generally appropriate when lawyer engages in conduct involving false swearing,

---

[12] At trial, the accused testified that he had "cured" approximately 140 of the wills and directives to physicians by re-witnessing them. Although those wills cured by the accused mitigate some of the actual harm caused by his misconduct, the potential harm caused by improperly witnessing the wills and directives to physicians was and remains great.

[13] Nonetheless, the mitigating value of that remorse is limited by the fact that the accused intentionally misled the Bar until after his secretary divulged the scope of his misconduct.

misrepresentation, dishonesty, fraud, or deceit); ABA Standard 7.1 (disbarment generally appropriate when lawyer knowingly engages in conduct in violation of a duty to the profession with intent to benefit the lawyer and causes serious or potentially serious harm).

Moreover, prior decisions by this court indicate that disbarment is the appropriate sanction. Conduct by a lawyer that deceives clients for the purposes of gaining money has been treated as warranting disbarment. *See, e.g., In re Miller,* 303 Or 253, 260, 735 P2d 591 (1987) (accused disbarred for overdrawing client account, misrepresenting his hours, and overbilling his clients). In addition, the accused repeatedly made misrepresentations to the Bar that obstructed its investigation. The aggregate conduct of the accused, misleading both his clients and the Bar, warrants disbarment. *See In re Spies,* 316 Or 530, 541-42, 852 P2d 831 (1993) (accused disbarred for, among other things, misleading clients, failing to provide competent representation, and not cooperating with the Bar); *see also In re Purvis, supra,* 308 Or at 459 (accused disbarred for misrepresenting to clients status of their cases, accepting payment without working on case, and failing to respond to investigative inquiries made by the Bar).

Accordingly, considering the ABA Standards and the prior decisions of this court, we conclude that the trial panel's decision of disbarment is correct.

The accused is disbarred.