Argued and submitted January 12, 2004, accused suspended from the practice of law for 36 months, effective 60 days from the date of the filing of this decision March 3, 2005

## In re Complaint as to the Conduct of

## NORMAN A. PHILLIPS,
*Accused.*

## (OSB 97-166, 97-167, 98-155; SC S49838)

107 P3d 615

Susan D. Isaacs, Beaverton, argued the cause and filed the briefs for the accused.

Mary Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this disciplinary proceeding, the Oregon State Bar alleged that the accused violated the Code of Professional Responsibility[1] through the conduct of another in violation of Disciplinary Rule (DR) 1-102(A)(1), made misrepresentations in violation of DR 1-102(A)(3), disclosed his clients's confidences or secrets in violation of DR 4-101(B)(1), used his clients' confidences or secrets for his own or another person's advantage in violation of DR 4-101(B)(3), aided nonlawyers in the practice of law in violation of DR 3-101(A), and continued to represent his clients without disclosing a conflict of interest in violation of *former* DR 5-101(A) (1996), *renumbered as* DR 5-101(A)(1) (1997). The trial panel found that the accused had not aided a nonlawyer in the practice of law but that he had violated the other disciplinary rules. The trial panel imposed a 24-month suspension. On *de novo* review, we find that the accused violated three of the six rules and suspend him from the practice of law for 36 months.

The accused has been a member of the Bar since 1968. In 1996, he and Cornilles were law partners. The partnership had between 1,500 and 2,000 clients and operated under the name of the Living Trust Law Center (the law firm). Together, the accused and Cornilles prepared living trusts for most of their clients. Their average client was over 60 years of age and had a net worth in excess of $300,000.

In February 1996, Wessels of Financial Services Network (FSN) contacted the law firm and proposed that the firm enter into a joint venture with FSN. The law firm had agreed to provide its clients with free periodic reviews of their living trusts, and FSN proposed that its licensed insurance agents could conduct those reviews under the accused and Cornilles' supervision. The insurance agents would meet with the law firm's clients in their homes, review their trusts, and also review the clients' financial information to ensure that the clients had funded their trusts properly.

---

[1] The Oregon Rules of Professional Conduct became effective January 1, 2005. Because the conduct at issue here occurred before that date, the Code of Professional Responsibility applies.

If the insurance agent determined that the trust should be updated, he or she would note that fact on a form and submit it to the law firm. Additionally, the agent would try to sell the accused's clients insurance products if the agent determined that the client needed either to replace an existing investment or purchase a new one. The agents' only compensation would come from the commissions on the insurance sales that they made. A third of the total commission would go to the agents, a third to FSN, and a third to the accused and Cornilles.

In late March or early April 1996, the accused and Cornilles telephoned Moore, a lawyer who specializes in legal ethics, to discuss FSN's proposal. In particular, they were concerned that sharing commissions and disclosing client information might violate the Code of Professional Responsibility. The accused and Cornilles spoke with Moore for approximately 15 minutes. Their conversation did not cover the specific terms of the joint venture but ranged generally over the question whether they could conduct the type of trust review program that FSN had proposed without violating their ethical duties as lawyers. Moore opined that they could.

The law firm entered a joint venture agreement with FSN and J.L. Kizer and Associates, Inc. On April 19, 1996, the accused and Cornilles sent a letter to 100 of their clients.[2] Written on the firm letterhead, the letter told each client that "[i]t is time to review your Living Trust and to make sure that your trust is properly funded." The letter noted that the clients may need to update their power of attorney, change the successor trustee, or modify the beneficiaries. The letter told the firm's clients that

> "we have carefully selected and trained three individuals: Alan Darby, Lori Guimond, and Mike Oxford to visit with you in your home. Beginning the week of *April 29th and May 6th*, they will be visiting with clients."

(Emphasis in original.)

---

[2] The accused and Cornilles later mailed the same letter to another 100 clients.

The letter also noted that the firm had received many requests for assistance with financial planning. It explained that

> "[i]f you are interested in saving money on either income or estate taxes, increasing your monthly income, or protecting yourself against inflation, our representatives can provide you with valuable information and services."

Immediately after that paragraph, the letter stated that "[t]here will be no charge for the trust review unless you need to make changes in your [legal] documents or execute new [legal] documents."

The accused and Cornilles knew from the beginning that the insurance agents' primary purpose was to sell their clients life insurance products. The joint venture agreement identified the sale of insurance products as the joint venture's sole purpose,[3] and a letter from J.L. Kizer and Associates had identified April 29 to May 10—the same period that the accused had told his clients the law firm's representatives would be visiting with them in their homes—as "[o]ur initial Sales Thrust Target." Despite that knowledge, the accused and Cornilles did not disclose in the April 19 letter that most of the firm representatives were out-of-state insurance agents, all were affiliated with FSN, and all were compensated solely by the commissions that they generated from the sale of insurance products.[4] Finally, the letter did not say that the accused or Cornilles would share in any commissions that the insurance agents generated.

After sending the letters, the law firm made follow-up calls to set up the trust reviews with the clients.[5] The accused and Cornilles instructed the insurance agents that, on arriving at a client's home, they should present two business cards. The first card contained the law firm's name, the

---

[3] The joint venture agreement states that its purpose is "to solicit insurance sales utilizing [J.L. Kizer and Associates]/FSN marketing agreements and soliciting agents and directed to the client data base of [the law firm]."

[4] The accused and Cornilles later explained that they did not identify the insurance agents as such because they were concerned that their clients would not agree to meet with the agents if they knew their true status.

[5] The law firm made the first 100 follow-up telephone calls. After that, the firm turned the task of making follow-up telephone calls over to FSN.

agent's name, and the law firm's address. The second card identified the reviewer as an insurance agent affiliated with FSN. The accused and Cornilles also told the agents that they should remind the clients that they were not lawyers before they began the review.

During the trust review, the agents would examine the client's trust documents as well as the client's financial documents. If the agent determined that the client needed to replace existing investments or purchase new ones, the agent would attempt to sell insurance products (typically either fixed annuities or life insurance) to the client. The accused and Cornilles instructed the agents that, if the client decided to purchase insurance products, the agents should disclose at the point of sale that the agent and the lawyers would receive a commission on the sale.

As the agents made their home visits, FSN provided the law firm with daily sales reports. The daily sales reports listed the client's name, whether the agent had made a sale, the insurance product that the client had purchased, and the premium. The daily sales reports also contained a space for the agents' comments. Some comments asked either the accused or Cornilles to contact the client and reaffirm the wisdom of the client's purchase. On one report, the agent noted that the client had purchased an insurance product that generated a $19,000 premium. The agent then noted, "Attorney should comment on the very wise decision the client made in getting out of the stock market." Another report lists a $96,000 premium and states, in the comment section, "Have [Cornilles] comment on how American National is a very strong company and [how the client will] be better off with the higher interest rates."

On May 3, 1996, after the insurance agents had begun conducting the in-home trust reviews, the accused and Cornilles asked Moore for a written opinion on the ethics of their joint venture. Although they supplied Moore with additional information, significant gaps remained. Moore understood that the agents would sell insurance products only infrequently. Given that understanding, Moore told the accused and Cornilles that he did not think that they needed to disclose, in the initial letter to clients, that they would

receive a portion of any sales commission.[6] After the joint venture began, the accused and Cornilles revised the introductory letter. The revised letter stated that, "If you [the client] purchase any investment or other products, we may receive compensation from the issuing company."[7] The accused and Cornilles sent the revised letter to approximately 1,500 clients over approximately a four-month period.

Throughout the joint venture, the accused and Cornilles maintained contact with Moore. On May 28, 1996, Moore sent a draft opinion letter to them noting possible problems with the joint venture under DR 3-101(A) (prohibiting aiding nonlawyers in unlawful practice of law), DR 3-103(A) (prohibiting nonlawyer partnership if practice of law is involved), DR 3-102(A) (prohibiting sharing legal fees with nonlawyers), and DR 2-103(A) (prohibiting acceptance of referral fees). Moore, however, resolved those issues in favor of the trust review program. In a July 19, 1996, letter to the accused, Moore concluded that the disclosure statement in the revised introductory letter was adequate.

The trust reviews began on April 29, 1996, and ended in the first part of November 1996. During that roughly six-month period, the accused, Cornilles, and FSN sent approximately 1,700 letters to the law firm's clients and made approximately 1,143 follow-up telephone calls. The insurance agents examined approximately 663 living trusts and sold annuities or life insurance policies to approximately 160 clients.[8] During that six-month period, the agents generated approximately $810,000 in commissions from the sale of insurance products to the accused's clients. The law firm received a third of that amount or approximately $270,000.

---

[6] Moore explained that, in his view, the accused and Cornilles had only a possible conflict, not a likely one. Accordingly, he did not see the need for an earlier disclosure.

[7] Although Moore had told the accused and Cornilles that they need not disclose any conflict of interest to their clients before the sale, they modified the letter after reviewing a letter from a Colorado lawyer involved in a similar joint venture.

[8] Although 160 clients purchased insurance products, 54 clients cancelled their purchases. Cornilles testified that the sales were cancelled for a variety of reasons, including the client's failure to qualify for the product, "buyer[']s remorse," and the client's decision not to incur the possibility of penalties if they later cancelled the purchase. As a result, only 106 of the original 160 sales actually resulted in a client purchasing and receiving an insurance product.

The venture was so successful that the law firm, primarily working through Cornilles, helped FSN develop and market a trust review program for other lawyers.[9] The law firm developed an 11-item checklist for other lawyers to use to operate a trust review program. The ninth item on the checklist told lawyers that, "[o]n rare occasions, particularly when a large sale is involved, it may be advisable for you to personally visit with the client * * * to confirm the credibility of the agent and reaffirm the advisability of the sale." The eleventh item on the checklist told lawyers who implemented a trust review program to "[s]it back and wait for the checks to roll in."

Some of the firm's clients were dissatisfied with the insurance agents' actions. Eight clients testified. All were elderly. Some of them or their spouses were in ill health when the agents visited them. Those clients testified that, when the insurance agents visited their homes, the agents gave them only the first business card—the card naming the agent and showing that he or she was the law firm's representative. The agents did not give the clients the second business card, which identified them as insurance agents affiliated with FSN. Some of the clients assumed that the agents were law firm employees and that the firm was paying them. They did not realize that either the agents or the lawyers would receive a commission on the insurance products that the agents were selling.

The clients testified that, once the insurance agents got inside the house, the agents reviewed the trust (sometimes briefly). They then turned to the clients' assets and the sale of insurance products. One woman in her early eighties said that, when she refused to sign the application for an annuity, the insurance agent became angry with her. She agreed initially to buy a $10,000 annuity because that was all that she and her husband could afford. She explained, however, that, by the time the insurance agent left their home, "he had every bit of our money [approximately $80,000] that

---

[9] In June 1996, FSN approached the law firm about marketing the trust review program to other lawyers. FSN and the law firm apparently entered into an agreement to that effect and by August had entered into marketing agreements with law firms in other states.

was in the bank." She was able to recover their money only after she reported the agent's actions to a government official.

Another couple had a similar experience. The wife was in her mid-seventies and her husband had problems breathing. The wife explained that her husband was "so worn down" by the insurance agent that they finally agreed to go to the bank, liquidate their savings, and buy an annuity. Because it was late in the day, they suggested going to the bank the next morning. The insurance agent, however, insisted that they liquidate their savings that day and drove them to the bank. When the bank employee asked the couple about their decision, the insurance agent interrupted and answered for the couple. The couple went through with the transaction but realized, immediately after the agent left, that they had made a mistake. They tried unsuccessfully to get in contact with him. After several attempts over the next few days, they finally were able to rescind the transaction.

A third couple liquidated a $500,000 IRA so that they could buy a fixed annuity. After approximately a year, they became dissatisfied with the annuity and called the issuing company to ask about cancelling it. Shortly afterwards, Guimond, the president of FSN, called to talk them out of cancelling the annuity. During that conversation, the couple realized that the person who had visited with them in their home and who they had thought was an employee of the law firm in fact had been an insurance agent affiliated with FSN.

The couple scheduled a meeting with the accused to discuss their concerns. Shortly afterwards, Guimond called the couple and said that she wanted to sit in on their meeting with the accused. The couple explained that they wanted to speak with the accused privately. Guimond, however, was at the law firm when the couple arrived for their meeting. The accused persuaded the couple to let Guimond participate. During the meeting, Guimond argued that the couple should keep the annuity. Her efforts proved unsuccessful, and the couple decided that it was better to incur approximately $45,000 in surrender charges than keep the annuity.

As noted, the trial panel found that the accused and Cornilles had violated the Code of Professional Responsibility through the acts of another, DR 1-102(A)(1), made misrepresentations, DR 1-102(A)(3), disclosed their clients' confidences or secrets and used them for their or another's benefit, DR 4-101(B)(1) and (3), and had a conflict of interest, *former* DR 5-101(A) (1996). The trial panel found, however, that the accused and Cornilles had not aided a nonlawyer in the unlawful practice of law, DR 3-101(A). The trial panel decided to suspend the accused from the practice of law for 24 months and to suspend Cornilles for 30 months. After the trial panel issued its decision, Cornilles submitted a Form B resignation, and only the charges against the accused remain on review.

On review, the parties do not challenge two of the trial panel's findings. The Bar does not challenge the trial panel's finding that accused did not aid the insurance agents in the unlawful practice of law in violation of DR 3-101(A). The accused, for his part, concedes that the trial panel correctly found that he had a conflict of interest in violation of *former* DR 5-101(A) (1996). Two issues remain on review. The first is whether the accused made misrepresentations. The second is whether he disclosed or used his clients' confidences or secrets.

██ ██ On the first issue, the trial panel found that the accused made five misrepresentations in violation of DR 1-102(A)(3):

"1. The Accused misled [his] clients by having trust reviewers present [law firm] business cards without clearly disclosing that the reviewers were also insurance salespersons and agents of [FSN].

"2. The Accused failed to fully disclose the purpose of the trust reviewer's contact with the clients.

"3. The Accused failed to disclose to [his] clients the affiliation of the Accused with [FSN].

"4. The Accused, through [his] agents who conducted trust reviews, participated in a scheme that collected a client's financial information for one purpose (to conduct a trust review) without fully disclosing that the Accused would, in addition, use that same information for an

entirely different purpose (in an attempt to sell insurance products).

"5. The Accused failed to disclose to some clients and failed to make timely (pre-purchase) disclosure to other clients of the financial interest of the Accused in the clients' purchase of insurance products."[10]

DR 1-102(A)(3) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving * * * misrepresentation." To establish that the accused made a misrepresentation, the Bar must prove by clear and convincing evidence that the misrepresentation was "knowing, false, and material in the sense that the misrepresentatio[n] would or could significantly influence the hearer's decision-making process." *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001). A lawyer makes a misrepresentation "either when the lawyer makes an affirmative false statement or when the lawyer remains silent despite having a duty to speak." *In re Lawrence*, 337 Or 450, 464, 98 P3d 366 (2004).

■ With that background in mind, we turn to the trial panel's findings. The trial panel found initially that the accused violated DR 1-102(A)(3) because the insurance agents presented only one of two business cards when they met the accused's clients; that is, the agents gave the accused's clients a card stating that they were from the accused's law firm but did not give them a second card stating that they were insurance agents affiliated with FSN. The accused argues that, even if insurance agents misrepresented their status by not presenting both cards, it does not follow that he violated DR 1-102(A)(3). The accused contends that he may be held accountable for the insurance agents' failure to disclose their true status only if he knew of the misrepresentation.

DR 1-102(A)(1) defines when, as a general rule, a lawyer is responsible under the Code of Professional Responsibility for another person's acts or omissions. It provides that it is "professional misconduct for a lawyer to * * * [v]iolate these disciplinary rules, knowingly assist or induce

---

[10] The Bar does not contend on review that the accused made additional misrepresentations.

another to do so, or do so through the acts of another." DR 1-102(A)(1). Under the terms of that rule, the accused is responsible for the insurance agents' misrepresentations only if he knowingly assists or induces them to make misrepresentations or knows that they are doing so. *See In re Ositis*, 333 Or 366, 373-74, 40 P3d 500 (2002) (holding lawyer responsible under DR 1-102(A)(1) for another person's misrepresentation when lawyer "understood [other person's] intentions and attached his own set of directions to the task").[11]

Here, the record shows that the accused told the insurance agents to present both cards when they visited the clients in their homes. Although eight persons testified that agents presented only the first card to them, none of those witnesses testified that they reported that omission to the accused or his law firm.[12] The accused may have been negligent in implementing a system that permitted the insurance agents to present only one of two business cards to his clients. He also may have been negligent in supervising the agents' actions, but the Bar failed to prove by clear and convincing evidence that the accused knew that the insurance agents were misrepresenting their status by presenting only one of the two business cards.

■     The remaining four allegations concern, in one form or another, the accused's failure to disclose the nature and purpose of the insurance agents' home visits. We begin with the trial panel's last finding because it puts the other three findings in context. The trial panel found that the accused failed to disclose, in a timely fashion, that he and his law partner had a financial interest in the agents' sale of any insurance products.

---

[11] As *Ositis* makes clear, the adverb "knowingly" modifies the verb "do" as well as the verbs "assist" and "induce." The decision in *In re Morin*, 319 Or 547, 878 P2d 393 (1994), does not point in a different direction. The court held in that case that a lawyer who gave his paralegals "too much freedom in dealing with clients, thereby allowing [the paralegals] to provide legal advice to those clients" violated DR 3-101(A). *Id.* at 564. The rule at issue in that case provides that "[a] lawyer shall not aid a nonlawyer in the unlawful practice of law" and does not contain the requirement—present in the rule at issue here—that the lawyer's conduct be knowing.

[12] The Martindells reported the agent's conduct to the accused a year after the agent met with them in their home, long after the trust review program had ended.

As the accused does not dispute, he had a duty to disclose that potential conflict of interest before his clients met with the insurance agents. *See former* DR 5-105(A) (1996) (prohibiting continued employment when lawyer's financial interest in transaction could affect lawyer's professional judgment unless lawyer obtains client's consent after full disclosure). There is also no dispute that the first 200 letters that the accused sent to his clients did not satisfy that duty. Those letters failed to mention either the accused's or his partner's financial interest in any insurance sales.[13]

That omission left the false impression that the accused was acting solely in his clients' interests in providing for trust reviews. If the accused's clients had known of his financial interest in the matter, they might not have agreed to the trust reviews that the accused recommended. The omission of any mention in the introductory letter of the accused's financial interest in any sale of insurance products was material, knowing, and a misrepresentation.

For similar reasons, we agree that the accused's failure to disclose, in the introductory letter to his clients, that the persons coming to the clients' homes were insurance agents (the trial panel's second finding), that the insurance agents were associated with FSN (the trial panel's third finding), and that the insurance agents would use the information they gained in reviewing the clients' trust to attempt to sell them insurance products (the trial panel's fourth finding) were also misrepresentations. The omission of that information left a false impression and was material. As the accused acknowledged, if his clients had known the agents' status and role, they might not have agreed to meet with them or disclose their financial information to them. Finally, the omission was knowing. In sum, the introductory letter that the accused sent to his clients contained four misrepresentations.

■ In support of its second cause of complaint, the Bar proved that the accused disclosed his clients' names,

---

[13] Although the accused had instructed the insurance agents to disclose his interest after the client had agreed to the sale, that disclosure comes too late to cure the earlier omission.

addresses, and the fact that they had a living trust to the insurance agents so that they could review the clients' trusts and sell them insurance products. The Bar contends that that disclosure violated two subsections of DR 4-101(B), which provides, in part:

"Except when permitted under DR 4-101(C), a lawyer shall not knowingly:

"(1) Reveal a confidence or secret of the lawyer's client.

"* * * * *

"(3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure."

On review, the accused argues that the information that he disclosed to the insurance agents was neither a confidence nor a secret. Alternatively, he argues that, because the insurance agents were acting as agents of the law firm, he did not reveal information to them in violation of DR 4-101(B)(1).[14] Because we find that the information that the accused disclosed constituted, under the circumstances of this proceeding, a client secret, we need not decide whether it was a client confidence.

DR 4-101(A) defines a secret, in part, as "information [other than a confidence] gained in a current or former professional relationship * * * the disclosure of which * * * would be likely to be detrimental to the client." By its terms, that rule focuses on the source of the information disclosed and the likely effect of the disclosure. Here, there is no question about the source of the information that the accused disclosed. He learned it from his clients in the course of representing them. The question instead is whether disclosing the information to the insurance agents was "likely to be detrimental to the [accused's] client[s]."

Five facts bear on that question. First, the accused held the agents out as representatives of the firm, erroneously suggesting that the agents would be acting in a fiduciary capacity.[15] Second, the accused did not disclose in the

---

[14] The accused does not contend that his actions came within one of the exceptions to the rule set out in DR 4-101(C), nor does he argue that his clients consented to his using their confidential or secret information after full disclosure.

[15] Both the introductory letter that the accused sent and the first business card held out the insurance agents as the firm's representatives. Even if the agents

introductory letters that either he or the agents would receive any commission from any sale that occurred—an omission that also would cause the clients to place greater trust in the agent's recommendations.[16] Third, during the home visits, the accused's elderly clients disclosed their confidential financial information to the insurance agents as part of the trust review process. Fourth, most of the insurance agents came from other states, none had an ongoing relationship with the accused's clients, and all received no compensation for their work in Oregon other than the commissions that they generated. Fifth, the accused's clients were, on average, affluent, elderly, and, as his law partner testified, more susceptible to salespeople.

In light of the false impression that the accused created that the agents would be acting in a fiduciary capacity, the agents' lack of an ongoing relationship with the accused's clients, the compensation structure, and the accused's clients' vulnerable status, we find that the disclosure was likely to result in this instance in the agents selling a substantial number of the accused's clients unnecessary insurance products, with the attendant transaction costs. As the record discloses, those costs were not insubstantial. The agents generated approximately $810,000 in commissions over a six-month period from the sale of insurance products to the accused's elderly clients. We conclude that, under the circumstances present here, the information that the accused disclosed was "likely to be detrimental" to his clients and thus a client secret within the meaning of DR 4-101(A).

Having concluded that the information that the accused disclosed was a secret, we turn to the question whether the accused knowingly disclosed that secret in violation of DR 4-101(B)(1) or knowingly used it for his own or

handed out a second business showing their affiliation with FSN, both the letter and the first business card left the erroneous impression that the agents would be acting as fiduciaries.

[16] The agents were supposed to disclose at the point of sale that the accused and Cornilles would receive a portion of the commission. Even if the agents disclosed that fact, and we find that many did not, the disclosure came too late. The agents did not make the disclosure until after the client had agreed to buy the insurance products.

another's advantage in violation of DR 4-101(B)(3). Regarding DR 4-101(B)(1), the accused argues that the persons to whom he revealed the information were the law firm's agents for the purposes of conducting the trust review. He argues that disclosing client secrets to law firm agents did not violate DR 4-101(B)(1) because the information disclosed was reasonably related to the agency. The Bar does not dispute either of the accused's propositions but contends that, even if the accused did not violate DR 4-101(B)(1), he still violated DR 4-101(B)(3).

We agree with the Bar that the accused violated DR 4-101(B)(3).[17] That rule prohibits lawyers from knowingly using their clients' confidences and secrets for their own or another person's advantage. In determining whether the accused violated that rule, there is little dispute that the accused disclosed his clients' names and addresses to FSN for his own or another's advantage. The disclosure resulted in approximately $810,000 in commissions for the accused, Cornilles, FSN, and its agents. The dispute centers instead on whether the accused acted knowingly; that is, did the accused know that the information he disclosed was "likely to be detrimental" to his clients and thus was a secret?

On that point, the accused sent out batches of letters to his clients, beginning on April 19, 1996, and ending on October 25, 1996.[18] Even if the accused were not aware that the disclosure was likely to be detrimental when he sent out the first letters, that conclusion became inescapable as the accused and Cornilles began receiving a staggeringly large amount of sales commissions. The amount of those commissions—standing alone—leads us to conclude that the accused knew that it was likely that the agents were persuading the accused's elderly clients to make unnecessary purchases. Additionally, the accused had actual notice of some problems. For instance, Cornilles and, we infer, the accused knew in

---

[17] In view of the Bar's apparent concession on DR 4-101(B)(1), we decline to find that the accused violated that rule.

[18] The accused's employee explained:

"The first group of letters was sent on approximately April 10, 1996, with subsequent mailings made on approximately May 13, June 5, June 13, June 19, July 12, July 17, July 18, July 19, July 29, October 2 and October 25, [1996]."

July 1996 that a client cancelled an earlier decision to sell her existing investments and buy an annuity when she discovered certain transaction costs that the agent had not mentioned. Similarly, Cornilles reported to the accused on September 16, 1996, that the daughter of another one of their clients was concerned "about [the agent] pressuring her mother."[19] We find that, at least by October, the accused was aware that the disclosure of his clients' names and addresses was likely to be detrimental, and yet he continued to disclose that information to FSN during the month of October in violation of DR 4-101(B)(3).

In its fifth cause of complaint, the Bar focused on one couple whom the accused represented, the Martindells. The Bar alleged that the accused, both as a result of his own conduct and as a result of an insurance agent's conduct, violated the same disciplinary rules that we have discussed. Our conclusions regarding the Martindells mirror the conclusions stated above, with one exception. Because the Martindells were among the first clients whom the insurance agents contacted, the Bar has not persuaded us that the accused violated DR 4-101(B)(3) in regard to them. However, the Bar has proved that the accused's other actions regarding the Martindells violated DR 1-102(A)(3) and *former* DR 5-101(A) (1996).

■    Having concluded that the accused violated DR 1-102(A)(3), DR 4-101(B)(3), and *former* DR 5-101(A) (1996), we turn to the appropriate sanction. We first consider: (1) the duty violated; (2) the accused's mental state; and (3) the actual or potential injury caused by the accused's conduct. *In re Kluge*, 332 Or 251, 259, 27 P3d 102 (2001); American Bar Association's *Standards for Imposing Lawyer Sanctions* 3.0 (1991) (amended 1992) (ABA Standards). We next decide whether any aggravating or mitigating circumstances exist. *Kluge*, 332 Or at 259; ABA Standard 3.0. Finally, we consider the appropriate sanction in light of the court's case law. *Kluge*, 332 Or at 259.

---

[19] Cornilles responded to the daughter's concerns by directing the agent not to meet with the mother any more and by telling the accused, who was going to be meeting with the mother, that "this sale can be saved with proper handling and reassurance from you that this is a good move for her."

■ The accused violated three duties that he owed his clients. He knowingly violated his duty to preserve his clients' secrets. ABA Standard 4.2. He knowingly violated his duty of candor to his clients. ABA Standard 4.6. Finally, the accused knowingly violated his duty to avoid conflicts of interest. ABA Standard 4.3. Regarding the actual or potential injury, some of the accused's clients sustained actual injury as a result of his violations. As noted, one couple had to pay a surrender fee of over $45,000 to cancel an investment. Others had to undertake substantial steps to avoid the investments that the insurance agents pressured them into purchasing. Still others faced the risk that the agents would pressure them into unnecessarily selling their existing investments and purchasing insurance products with, as the record shows, substantial transaction costs.

The ABA Standards establish, as a preliminary matter, that suspension is the appropriate sanction for each of the three violations. They provide that "[s]uspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client." ABA Standard 4.62. Similarly, "[s]uspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client." ABA Standard 4.22. Finally, "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." ABA Standard 4.32.

Having made a preliminary determination concerning the sanction, we next consider any aggravating and mitigating circumstances. We find three aggravating circumstances. First, the accused had a selfish motive. ABA Standard 9.22(b). The accused repeatedly put his own interest in receiving commissions from the sale of insurance products above his clients' interests. Second, the accused committed three interrelated violations and did so multiple times. ABA Standard 9.22(d). Finally, the accused's elderly clients were particularly vulnerable. ABA Standard 9.22(h). The

record discloses that the accused's clients trusted their lawyer and believed that they could trust the persons whom he had sent to help them.

The accused identifies two mitigating circumstances: the absence of a prior disciplinary record and his reliance on Moore's ethics advice. We agree that the accused has no prior disciplinary record. ABA Standard 9.32(a). We also have observed that reliance on timely ethics advice may provide mitigation. *In re Benett*, 331 Or 270, 281, 14 P3d 66 (2000); *see* ABA Standard 9.31 (defining "mitigating circumstances" generally as "any considerations or factors that may justify a reduction in the degree of discipline to be imposed"). We give that factor little weight here, however. The accused and Cornilles entered into the joint venture with FSN before providing the details of that venture to Moore. Even when they later provided additional information to Moore, they failed to disclose a critical fact. Cornilles told Moore that the trust reviewers would sell insurance products to the accused's clients "in only a minority of cases." Indeed, Moore understood that the likelihood of a sale was so remote that the possibility of the accused's receipt of a commission from a sale created only a possible conflict of interest.

As the amount of the commissions that the agents generated suggests, the likelihood of a sale was greater than Moore understood. Had Moore had accurate information regarding the joint venture, he might have concluded, as we do, that the accused used client secrets for his own advantage, failed to disclose a conflict of interest, and made misrepresentations to his clients. In these circumstances, we give only little weight to the accused and Cornilles' reliance on Moore's advice.[20] Having considered the aggravating and mitigating factors, we conclude that, although the accused had no prior disciplinary record and did consult an ethics lawyer, his selfish motive, the number of violations, and the

---

[20] The accused also contends that delay in the disciplinary proceedings is a mitigating factor. ABA Standard 9.32(j) (amended 1992). The accused, however, does not provide any facts or argument to support this contention. We note that, although this proceeding has taken a substantial amount of time to litigate, the case is factually complex and was hard fought. In the absence of any showing that the Bar took an unreasonably long period of time to pursue this matter, we do not give this factor any weight.

heightened vulnerability of some of his clients substantially outweigh the mitigating factors.

Finally, we turn to this court's case law for guidance. Relying on *In re Morin*, 319 Or 547, 878 P2d 393 (1994), the Bar argues that disbarment is the appropriate sanction. In *Morin*, the lawyer intentionally and repeatedly directed his staff to certify falsely that they had witnessed his clients sign documents. He intentionally lied to the Bar when asked about that practice, and he assisted his staff in unlawfully practicing law. Finally, as this court found, the lawyer committed theft by deception. In this proceeding, the accused's conduct was not criminal, and the intentional disregard for the clients' interests that was present in *Morin* is absent here.

We do not mean to minimize the accused's actions. He effectively sold his client list to insurance agents for a cut of the commission. He withheld information from potentially vulnerable clients in order to permit those agents to gain access to them in their homes, and he failed to provide a timely disclosure of his conflict of interest. Given the scale of the accused's misrepresentations and conflicts of interest, coupled with his selfish motive for committing the misconduct and the actual and potential injury involved in his misconduct, we determine that the accused should be suspended from the practice of law for 36 months.

The accused is suspended from the practice of law for 36 months, effective 60 days from the date of the filing of this decision.